AO 241
(Rev. 10/07)



# PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| | | |
|---|---|---|
| **United States District Court** | District: **Eastern** | |
| Name (under which you were convicted): **Robert Williams** | | Docket or Case No.: |
| Place of Confinement: **Louisiana State Penitentiary** | Prisoner No.: **396029** | |
| Petitioner (include name under which you were convicted) **Robert Williams** | v. | Respondent (authorized person having custody of petitioner) **Darryl Vannoy, Warden** |
| The Attorney General of the State of Louisiana | | |

16-10920
SECT. G MAG. 1

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: Criminal District Court, Orleans Parish

(b) Criminal docket or case number (if you know): 476-208

2. (a) Date of the judgment of conviction (if you know): November 5, 2008

(b) Date of sentencing: March 23, 2011

3. Length of sentence: 99 years w/o benefits

4. In this case, were you convicted on more than one count or more than one crime? X Yes ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case: Two Counts of Armed Robbery With a Weapon: LSA-R.S. 16:64.3

6. What was your plea? (Check one)

X (1) Not guilty ☐ (3) Nolo contendere (no contest)

☐ (2) Guilty ☐ (4) Insanity Plea

TENDERED FOR FILING

JUN 3 - 2016

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

(b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count what did you plead guilty to and what did you plead not guilty to?

(c) If you went to trial, what kind of trial did you have? (Check one)

X Jury ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?

☐ Yes X No

8. Did you appeal from the judgment of conviction?

X Yes ☐ No

9. If you did appeal, answer the following:

(a) Name of court: **Fourth Circuit Court of Appeals**

(b) Docket or case number (if you know): **2010 WL 9872035**

(c) Result: **Conviction affirmed; sentence remanded**

(d) Date of result: **November 24, 2010**

(e) Citation to the case (if you know):

(f) Grounds raised: **Trial court erred in failing to Grant the Motion to Suppress; trial court erred when it denied Mr. Williams' Motion in Liminse regarding the victim's status as "church volunteers"; trial court erred when it refused to allow the defense to adduce the text messages and their time stamps into evidence; trial court erred when it refused to allow Mr. Williams' statements to the arresting officer into evidence; trial court erred when it failed to Grant a mistrial during Closing Arguments, premised upon improper, inflammatory and unprofessional conduct by the prosecutor in Rebuttal; trial court erred when it did not Grant the Motion for Post-Verdict Judgment of Acquittal.**

(g) Did you seek further review by a higher state court? X Yes ☐ No

If yes, answer the following:

(1) Name of court: **Louisiana Supreme Court**

(2) Docket or case number (if you know):

(3) Results: **Affirmed**

(4) Date of result (if you know):

(5) Citation to the case (if you know):

(6) Grounds raised:

(h) Did you file a petition for certiorari in the United States Supreme Court? ☐ Yes X No

If yes, answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court? X Yes ☐ No

11. If your answer to Question 10 was "Yes", give the following information:

(a) (1) Name of court: Criminal District Court: Parish of Orleans

(2) Docket or case number (if you know): 476-208

(3) Date of filing (if you know): July 17, 2014

(4) Nature of the proceeding: Application for Post-Conviction Relief

(5) Grounds raised: Defense counsel was ineffective prior to, during and after trial; Prosecutorial misconduct; prosecution failed to disclose material impeachment evidence of an alleged eyewitness, Andrew Francis, which undermined confidence in the reliability of the verdict in violation of *Brady; Giglio, Napue*, and progeny cases in violation of Mr. Williams' rights under the United States Constitution.

(6) Did you receive a hearing where evidence was given on your petition, application or motion?

☐ Yes X No

(7) Result: August 27, 2014

(8) Date of result (if you know): Denied

(b) If you filed any second petition, application or motion give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application or motion?
□ Yes X No

(7) Result: Denied

(8) Date of result (if you know):

(c) If you filed any third petition, application or motion, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application or motion?
□ Yes □ No

(7) Result:

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction the result of action taken on your petition, application or motion?

(1) First petition: □ Yes □ No

(2) Second petition: □ Yes □ No

(3) Third petition: □ Yes □ No

(e) If you did not appeal to the highest state court having jurisdiction, explain briefly why you did not:

12. For this petition, state every ground which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust (use up) your available state court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

GROUND ONE: **Trial court erred when it failed to Grant the Motion to Suppress Identification.**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): **See Memorandum in Support**

(b) If you did not exhaust your state remedies on Ground One, explain why:

(c) **Direct Appeal of Ground One: Same**

(1) If you appealed from the judgment of conviction, did you raise this issue? X Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? ☐ Yes X No

(2) If you answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If you answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If you answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One:

GROUND TWO:

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☐ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☐ No

(2) If you answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If you answer to question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If you answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two:

GROUND THREE:

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☐ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☐ No

(2) If you answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If you answer to question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If you answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:

**GROUND FOUR:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Four, explain why:

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☐ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☐ No

(2) If you answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If you answer to question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If you answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four:

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? ☐ Yes ☐ No

If you answer is "No," state which grounds have not been do presented and give your reason(s) for not presenting them:

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, ground or grounds have not been presented, and state your reasons for not presenting them:

14 Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? ☐ Yes ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy or any court opinion or order, if available.

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? ☐ Yes ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised.

(16) Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: C. Gary Wainwright, 405 S. Broad St, New Orleans, LA 70119.

(b) At arraignment and plea: C. Gary Wainwright, 405 S. Broad St, New Orleans, LA 70119.

(c) At trial: C. Gary Wainwright, 405 S. Broad St, New Orleans, LA 70119.

(d) At sentencing: Stuart Weg, 201 St. Charles Ave., Suite 114-104, New Orleans, LA 70170

(e) On appeal: C. Gary Wainwright, 405 S. Broad St, New Orleans, LA 70119.

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? □ Yes X No

(a) If so, give the name and location of the court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d). Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? □ Yes X No

18. TIMELINESS OF PETITION: If you judgment of conviction became final over one year ago, you must explain the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.

Therefore, petitioner asks that the Court grant the following relief: **The district court has failed to properly review the Issues during the course of the collateral review. The Affidavits show that the identification was flawed and that counsel had failed to investigate the case. Also, on collateral review Mr. Williams was not appointed counsel to assist him with his ineffective assistance of counsel Issue. Under the provisions of *Martinez v. Ryan*, 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), ineffective assistance of counsel Issues should have counsel appointed due to the fact that collateral review is the first opportunity to file such. Furthermore, as Mr. Williams had the same counsel during Appeal that he had during trial, counsel would not file ineffective assistance of counsel against himself** or any other relief to which petitioner may be entitled.

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on (month, day, year).

Executed (signed) on 6th day of June, 2016 (date)

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

RECEIVED
JUN 08 2016
Legal Programs Department

SCANNED at LSP and Emailed
6/8/16 by JM . ______ pages
date initials No.

AO 241
(Rev. 10/07)



# Petition for Relief From a Conviction or Sentence By a Person in State Custody

(Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

## Instructions

1. To use this form, you must be a person who is currently serving a sentence under a judgment against you in a state court. You are asking for relief from the conviction or the sentence. This form is your petition for relief.

2. You may also use this form to challenge a state judgment that imposed a sentence to be served in the future, but you must fill in the name of the state where the judgment was entered. If you want to challenge a federal judgment that imposed a sentenced to be served in the future, you should file a motion under 28 U.S.C. § 2255 in the federal court that entered the judgment.

3. Make sure the form is typed or neatly written.

4. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5. Answer all questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6. You must pay a fee of $5. If the fee is paid, your petition will be filed. If you cannot pay the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution if holding for you. If you account exceeds $________, you must pay the filing fee.

7. In this petition, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different court (either in the same state or in different states), you must file a separate petition.

8. When you have completed this form, send the original and two copies to the Clerk of the United States District Court at this address:

Clerk's Office, U.S. District Court
Eastern District of Louisiana
500 Poydras Street, Room C-151
New Orleans, LA 70130

9. **CAUTION: You must include in this petition all grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

10. **CAPITAL CASES: If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

TENDERED FOR FILING
JUN 3 - 2016
U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**ROBERT WILLIAMS**

**VERSUS No.:________________**

**DARRYL VANNOY, WARDEN**

On Petition For Federal Habeas Corpus Pursuant To 28 U.S.C. § 2254; From the Criminal District Court, Parish of Orleans, State of Louisiana, Docket Number 476-208.

Respectfully submitted this 6th day of June, 2016.

ROBERT WILLIAMS, #396029
CBA/LR-6
LA. STATE PENITENTIARY
ANGOLA, LA 70712

**CIVIL PROCEEDINGS**

## TABLE OF CONTENTS:


TABLE OF AUTHORITIES ..... iii

MEMORANDUM OF LAW ..... 1

PROCEDURAL HISTORY ..... 1

NOTICE OF PRO-SE FILING ..... 3

STATEMENT OF THE FACTS ..... 3

FEDERAL QUESTIONS PRESENTED ..... 14

TIMELINESS OF THIS PETITION ..... 15

STANDARD OF REVIEW ..... 16

ISSUES TO BE CONSIDERED ..... 16

ARGUMENT(S) OF LAW ..... 17

ARGUMENT 1 ..... 17

**The trial court erred with it failed to Grant the Motion to Suppress Identification** ..... 17

**Louisiana Jurisprudence** ..... 18

ARGUMENT 2 ..... 20

**Denial of Motion in Liminiae regarding the victims' status as "church volunteers."** ..... 20

**Relevant Evidence Defined:** ..... 20

ARGUMENT 3 ..... 21

**The trial court erred when it refused to allow the defense to adduce the text messages and their time stamps into evidence** ..... 21

ARGUMENT 4 ..... 22

**The trial court erred when it refused to allow Mr. Williams' statements to the arresting officer into evidence** ..... 22

ARGUMENT 5 ..... 23

**The trial court erred when it failed to Grant a Mistrial during Closing Arguments, premised upon improper, inflammatory and unprofessional conduct by the prosecutor in Rebuttal** ..... 23

ARGUMENT 6 ..... 23

**The trial court erred when it did not Grant the Motion for Post-Verdict Judgment of Acquittal** ..... 23

ARGUMENT 7 .......... 25

**Defense counsel rendered ineffective assistance prior to, during, and after trial** .......... 25

**A. Defense Counsel Failed to Prepare and Perform Proper Pretrial Discovery, Investigation, and Interview of Witnesses** .......... 26

**B. Defense Counsel Failed to Present a Defense** .......... 31

**C. Cumulative Errors Denied Mr. Williams a Fair and Reliable Trial** .......... 33

ARGUMENT 8 .......... 34

**Prosecutorial Misconduct** .......... 34

ARGUMENT 9 .......... 39

**The prosecution failed to disclose material impeachment evidence of an alleged eyewitness, Andrew Francis, which undermined the confidence in the reliability of the verdict in violation of Brady, Giglio, Napue, and progeny cases in violation of Mr. Williams' rights under the United States Constitution** .......... 39

**1. The Brady Rule** .......... 39

CONCLUSION AND PRAYER .......... 45

CERTIFICATE OF SERVICE .......... 46

## EXHIBITS:

"A" Affidavit of Emily Zolynsky dated August 25, 2011;

"B" Affidavit of Emily Zolynsky dated August 25, 2011;

"C" Affidavit of Catherine Mears dated August 26, 2011;

"D" Affidavit of Bobbie Bester dated July 5, 2013;

"E" Affidavit of Alisa Bester dated July 31, 2013;

"F" Affidavit of Stuart M. Weg, bar no. 31357, dated March 24, 2014; and,

"G" Affidavit of Andrew Francis (victim), dated May 29, 2014.

# TABLE OF AUTHORITIES:

## U.S. CONSTITUTION:

Fifth and Fourteenth Amendments to the United States Constitution....32
Fifth, Sixth and Fourteenth Amendments to the United States Constitution....31
Fifth, Sixth, Eighth and Fourteenth Amendment rights to the United States Constitution.....33, 34
Fourth and Fourteenth Amendments to the United States Constitution....17
Sixth Amendment of the United States Constitution....15, 25, 31, 33

## FEDERAL CASES:

Anderson v. Johnson, 338 F.3d 382, 391 (5th Cir. 2003)....26
Artuz v. Bennett, 121 S.Ct. 361, 531 U.S. 4 (2000)....15
Brady v. Maryland, 373 U.S. 83, 87 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963)....39
Bryant v. Scott, 28 F.3d 1411, 1418 (5th Cir. 1994)....27
Carey v. Saffold, 122 S.Ct. 2134, 536 U.S. 214 (2002)....15
Chapman v. California, 386 U.S. 17, 18 S.Ct. 824, 17 L.Ed.2d 705 (1967)....20
Crume v. Beto, 383 F.2d 36, 39 (CA5 1967)....18
Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)....39
Dunn v. United States, 307 F.2d 883, 886 (5th Cir. 1962)....38
Engle v. Issac, 456 U.S. 197 (1982)....31
Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402, 407 (1969)....18
Government of Virgin Islands v. Toto, 529 F.2d 278, 283 (3rd Cir. 1976....38
Greer v. Miller, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)....37
Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)....3
Houston v. Estelle, 569 F.2d 372, 380 (5th Cir. 1978)....38
Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981)....24
Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)....24
Kimmelman v. Morrison, 477 U.S. 365, 385 (1986)....27
Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1887 (1972)....32
Kyles v. Whitley, 115 S.Ct. 1555 (1995)....44
Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)....17, 32
McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 14441, ___ L.Ed.2d 763 (1970)....31
Napue v. Illinois....43
Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985)....26
Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)....17, 32
Sanders v. Rotelle, 21 F.3d 1446, 1456 (9th Cir. 1994)....26
Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199, 1206 (1967)....17
Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 647 (1984)....25
Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999)....39
Taylor v. Kentucky, 436 U.S. 478, 487, NO. 15, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978)....33
United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)....34, 40, 44
United States v. Diharce-Estrada, 526 F.2d 637, 640 (5th Cir. 1976)....39

United States v. Meros, 866 F.2d 1304, 1309 (11th Cir. 1989)......40
United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1994)......38
United States v. Wyly, 193 F.3d 289, 299 (5th Cir. 1999)......37
Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)......31
Williams v. Taylor, 120 S.Ct. 1495, 529 U.S. 362 (2000)......16
Yarborough v. Alvarado, 124 S.Ct. 2140, 541 U.S. 652 (2004)......16

## FEDERAL STATUTORY PROVISIONS:

28 U.S.C.A. § 2244(d)(1)......15
28 U.S.C.A. § 2244(d)(2)......15
28 U.S.C.A. § 2254......1, 16, 46
28 U.S.C.A. § 2254(d)(2)......16

## LA CONSTITUTION:

Article I, § 13 of the Louisiana Constitution of 1974......25, 33
Louisiana Constitution of 1974, § 2, 5......17
Louisiana Constitution of 1974, Art. I § 3, 12, 13, and 16......32
Louisiana Constitution of 1974, Art. I, § 16......31

## STATUTORY PROVISIONS:

La.C.Cr.P. Art. 703 (D)......18
La.C.Cr.P. Art. 727......21
La.C.Cr.P. Art. 821......23
LSA-C.E. Art. 401......20
LSA-C.E. Art. 403......20
LSA-R.S. 14:6......1p.
LSA-R.S. 14:64.3......1p.
R.S. 15:449......22
R.S. 15:450......22

## STATE CASES:

Bridges v. Florida, 466 So.2d 348 (Fla. App. 1983)......33
In re: Charles Gary Wainwright, No. 2012-B-1392......26
State v. Berry, 430 So.2d 1005, 1007 (La. 4/4/83)......31
State v. Bickman, 404 So.2d 929, 934 (La. 1981)......19
State v. Brady, 414 So.2d 364 (La. 1982)......24
State v. Brown, 313 So.2d 581 (La. 1975)......38
State v. Gremillion, 542 So.2d 1074 (La. 1989)......22, 32
State v. Guillory, 373 So.2d 133......23
State v. Gurley, 565 So.2d 1055, 1062 (La. App. 4th Cir. 1990)......18
State v. Hearold, 603 So.2d 731 (La. 1992)......24
State v. Higgins, 2003-1980, p. 19 (La. 4/1/05), 898 So.2d 1219, 1232-33......18

State v. Holmes, 931 So.2d 1157 (La. App. 4th Cir. 2006) ....................18
State v. Kaufman, 304 So.2d 300 (La. 1974) ....................38
State v. Leger, 2005-0011, p. 59, (La. 7/10/06), 936 So.2d 108, 151 ....................18
State v. Martin, 582 So.2d 306 (La. App. 1st Cir. 1991) ....................22
State v. Offray, 797 So.2d 764 (La. App. 4th Cir. 2001) ....................19
State v. Phillips, 337 So.2d 1157 (La. 1976) ....................38
State v. Scales, 655 So.2d 1326 (La. 1995) ....................21
State v. Smith, 499 So.2d 340 (La. App. 4th Cir. 1986) ....................18
State v. Van Winkle, 658 So.2d 198 (La. 1995) ....................31
State v. Vigee, 518 So.2d 501 La. 1988) ....................32
State v. Williams, 108 So.3d 319 (La. App. 4th Cir. 2013) ....................2
State v. Williams, 2010 WL 9872035 (La. App. 4th Cir. 2010) ....................1

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ROBERT WILLIAMS** | CIVIL ACTION |
| -Versus- | NUMBER: |
| | JUDGE: |
| **DARRYL VANNOY, Warden** | MAGISTRATE: |

---

**MEMORANDUM OF LAW IN SUPPORT**
**OF PETITION FOR FEDERAL HABEAS CORPUS**

---

**MAY IT PLEASE THE COURT:**

**NOW INTO COURT** comes Robert Williams, *pro se* Petitioner, who respectfully presents his "Memorandum of Law in Support of Petition for Federal Habeas Corpus"; and who respectfully prays this Honorable Court will accept and consider same in connection with his "Petition for Federal Habeas Corpus", pursuant to *28 U.S.C.A. § 2254.*

## PROCEDURAL HISTORY

Mr. Williams was charged with two counts of Armed Robbery With a Firearm, in violation of LSA-R.S. 14:64.3. On November 5, 2008, Mr. Williams was found guilty as charged to both counts after a jury trial. On December 4, 2008, Mr. Williams was sentenced as to both counts to ninety-nine (99) years at hard labor without the benefit of Probation, Parole, or Suspension of Sentence. Counts One and Two were to run concurrent with each other and Mr. Williams was given credit for time served. On November 24, 2010, the Louisiana Fourth Circuit Court of Appeals affirmed Mr. Williams' conviction. However, the matter was remanded to the trial court for re-sentencing. *State v. Williams*, 2010 WL

9872035 (La. App. 4th Cir. 2010).

On August 26, 2011, Mr. Williams was re-sentenced by the district court as to Count One to ninety-Four (94) years at hard labor without the benefit of Probation, Parole, or Suspension of Sentence. As to Count Two, the firearm enhancement, Mr. Williams was sentenced to five (5) years at hard labor without the benefit of Probation, Parole, or Suspension of Sentence. Counts One and Two were to be run consecutive with each other. The Louisiana Supreme Court denied Writs in Case No. 2010-KO-2837. However, in *__State v. Williams__*, 108 So.3d 319 (La. App. 4th Cir. 2013), the Court affirmed Mr. Williams' conviction, but vacated and remanded the matter to the trial court for re-sentencing again. On March 22, 2013, Mr. Williams was re-sentenced as to Count One, ninety-four (94) years at hard labor without the benefit of Probation, Parole, or Suspension of Sentence. As to LSA-R.S. 14:64, and a consecutive five (5) years at hard labor without the benefit of Probation, Parole, or Suspension of Sentence as to LSA-R.S. 14:64.3.

As to Count Two of the Armed Robbery, Mr. Williams was sentenced to ninety-four (94) years and another consecutive five (5) years at hard labor without benefits as to LSA-R.S. 14:64.3. Mr. Williams was also assessed court cost of $35.00. Counts One and Two of the Armed Robbery convictions were to run concurrent with each other.

Mr. Williams filed his Application for Post-Conviction Relief containing two claims in the Criminal District Court on or about July 17, 2014, and Supplemented his Application with one claim on or about August 1, 2014. On August 27, 2014, the trial court summarily denied the Application for Post-Conviction Relief and all motions.

Mr. Williams filed for Supervisory Writ of Review to the Louisiana Fourth Circuit Court of Appeals on September 24, 2014. After ordering the State to file Objections, the Court of Appeals denied Mr. Williams' Writ on May 11, 2015.

Mr. Williams timely filed for Supervisory Writs to the Louisiana Supreme Court. On May 20, 2016, the Supreme Court denied relief.

Mr. Williams now files the instant petition for federal habeas corpus.

## NOTICE OF PRO-SE FILING

Mr. Williams requests that this Honorable Court view these Claims in accordance with the rulings of ***Haines v. Kerner***, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Mr. Williams is a layman of the law and untrained in the ways of filings and proceedings of formal pleadings in this Court.

It should be noted that in one of the most well-noted cases decided by the United States Supreme Court concerning ineffective assistance of counsel was ***Gideon v. Wainwright***, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), where Gideon had hand-written the Supreme Court complaining of his attorney's assistance in his case. The United States Supreme Court did not hold Mr. Gideon to the same standards as a professional attorney at that time. Therefore, Mr. Williams is requesting the same from this Honorable Court.

## STATEMENT OF THE FACTS

On Monday, January 21, 2008, Mr. Andrew Francis and Mr. Paul Currer were in New Orleans working as volunteers of the "Episcopal Diocese Disaster Response." The two were among the thousands who volunteered to come to "Post-Katrina" New Orleans to help with the reconstruction efforts. Neither of them resided within the so. Mr. Andrew Francis resided in Iowa and Mr. Paul Currer resided in Virginia.

On that particular morning, the two transported a "load" of framing lumber to the gutted home located at 1814 Duels Street. When the two arrived at the residence at approximately 8:30 am, they unlocked the home and were in the process of determining where to unload the lumber, when a lone

male subject approached Mr. Francis, who had returned to the front porch. Mr. Currer was wandering around "inspecting" the home.

According to Mr. Francis, the subject ordered "them" to go back into the house, while pointing a "black pistol" at him. The two men were "backed up" into the "second room" of the house, when the subject demanded money. Mr threw his wallet containing $6.00 on the floor. When the subject saw that Mr. Francis only had six dollars, he asked: "Is that all you have?" The subject then turned to Mr. Currer, who threw one hundred forty (140) dollars to the ground.

The subject picked up the money and stated: "You do not come into my neighborhood without paying me first." He then told the two "to not do anything stupid" and left.

Mr. Francis estimated that the encounter took "ten to fifteen minutes." Mr. Currer estimated it was a "few minutes. It might have been five to eight ... It seemed like a long time, but it wasn't that long."

Mr. Currer testified that Mr. Francis walked to the front of the home, while he stayed in the "second room." While he was looking at framing he heard someone say, "Stop." He then began walking to the front of the house, where he observed "a man with a gun held on Mr. Francis." Mr. Currer said he was ten to fifteen feet away from the subject. His description of what happened *once he saw the man with Andy on the porch* and then to two come into the house, comports with Mr. Francis' description for the most part.

The two men watched the subject leave and then "waited a while" before they left. Once in the truck, Mr. Jackson called the Coordinator and he was directed to a nearby McDonald's. When they arrived at the McDonald's, the police were there.

Mr. Currer testified that the description he gave the officers was: about 5'8" or 9', 160 pounds, late twenties, maybe 28, clean cut appearance, no tattoos, no facial hair, no gold teeth, short hair, blue jeans and a description of his jacket.

Mr. Francis testified that the description he gave the officer was: about 6', two hundred pounds, clean cut short hair, dark baggy pants, dark shoes, and a white zippered jacket with red writing across it.

Ms. Stephanie Briscoe, a Senior Police Dispatcher, was called by the State to identify the 911 tape associated with this incident; as well as the incident recall log. The *self-identified* caller on the 911 call log was Andy Francis.

The transcript of the incident recall log evinces that at 8:55 am, the following description was recorded: "the perpetrator is a Black male about 5'9", zipper down white sweatshirt, baggy black jeans. Subject armed with a Glock."

Continuing the transcript reflects that at 9:35 am, a second description was broadcast after Detective Colon interviewed the victims. "Perpetrator is black male, light complexion, 5'8" to 5'9", 28 to 30 years old, about 180 pounds, white sweatshirt with red writing, dark baggy jeans. Subject armed with an unknown type of handgun, possible Glock."

After being interviewed by the police at the McDonald's, the two men went back to their duties. The NOPD broadcast the "description" and several hours passed. At this juncture, what occurred is portrayed in three radically different and irreconcilable versions of fact.

Mr. Francis testified at the motions hearing, and at trial, that afternoon, "two or three hours" from the time of the robbery, he received a call from Detective Cologne. He was informed that "... they had picked up somebody that fit our description ... And she wanted to know if we would like to ID him, and we said yes." The two men met Detective Cologne at the "warehouse" and she drove them to where he was.[1]

1 Rec.p. 98, 14-21. During motions hearing, he testified that on the way to the show-up, they were told "the suspect had been arrested while in a stolen car." There was never any evidence adduced that Mr. Williams was "in a stolen car." He absolutely as not booked with any such alleged or related offense. How Mr. Williams ever came into police custody remains a mystery.

Mr. Francis describes the scene thus: "The defendant was in an unmarked squad car surrounded by 10 to 15 other squad cars; there were 30 to 35 officers milling around the area, and we got out of the car and they took him out of the vehicle and there was like a wall of police officers, like three or four police officers standing shoulder to shoulder so that we could view him but he could not see us ..." He placed Mr. Currer next to him at this moment.

He testified that Mr. Williams was first exhibited to him 30 or so feet away. He was asked "Is this the man who robbed you? ... I told him that I was pretty sure, but not 100 per cent sure because I could not see – I could not clearly see the man, he was too far away ... I asked that he be moved closer."

Mr. Williams was then moved to approximately 15 feet away. "I said again 'I am not 10 per cent sure.' The police officer said 'we can't prosecute him if you are not sure.' So, I said, 'Well, I need – can he – can you stand him up? Can he stand up straight? ... I asked if they could make him have 'correct posture.'"

After Mr. Williams was made to have "correct posture." Mr. Francis testified that he told the police, "He has the same features. He's about the same height. He has the same build and he's wearing the same clothes."

Mr. Currer described the event thusly: "We heard from the police several hours later. They said they had someone they thought might be the suspect, could we come identify the person ... a female officer took us to another location where there was ... a show-up ... I saw seven or eight squad cars a fair ways away, 60, 70 yards. I saw a person ... he had on handcuffs and leg irons ... He was bent over ... there were police in the area and officers came up to Andy and me asked us if we could identify him ... My initial response was he was so far away I couldn't identify him, 60 or 70 yards ... He was very off in the distance. It was sort of a side look at the person ... the police started bringing him closer."

I was told by the police: "We don't want to bring him close to you. We don't really want him to see

that you are here."

"He started to come closer ... he was about the right height ... the right build ... It started to look like him. But I wasn't – I wasn't certain ... I was still uncertain until they brought him within about 30 yards."

"At that point, the police asked if we could recognize him and before we answered, they split us up. I'd say he was about ... 30 yards, it's about 90 feet ... When I recognized the police (sic), I said yes, that was the person. I was sure ..."

Detective Cologne described the show-up as occurring in the following manner:

"My supervisor, ***Sergeant Lauri and one of the other detectives*** relocated to pick them up ... I walked to the vehicle in which they were, and I believe Mr. Francis was the first persons ***that I got out of the vehicle*** ... advised him we had a possible suspect, and I was going to walk him toward the suspect; to let me know when he could clearly see the suspect, and if he would be able to identify him as the suspect ... and we continued walking towards the direction of the suspect ..."[2]

Mr. Francis was able to make the identification from "a couple of car lengths ... Mr. Williams was on the opposite side of the police unit. He was taken out of the police unit and we just started approaching. There was one or more vehicles between us and we were standing in front of the second vehicle ... He stated that was the subject who robbed him. I asked if he was sure and he stated yes."

"Mr. Williams was on the left side of the police vehicle, so you could see him from the waist up ... what I am saying is he was on the other side of the police car that (sic "he") was being covered by the trunk, so all you could see is his waist up." To her recollection, Mr. Williams was presented only in handcuffs, with his hands cuffed behind his back. Sgt. Lauri was standing on his (Mr. Williams') left side and there might have been another detective standing with him.

2 Rec.V. 2, p. 44, 21-27. In fact both lay person's testimony that Det. Cologne was the one who picked them up, she insisted she was on or at the location* where Mr. Williams was being detained, "speaking with the officers (there) to see if they could hold him until the victim showed up." *1900 block of Touro Street.

Detective Cologne continued: "Mr. Francis was walked back to the vehicle and ... *Mr. Currer was taken out* ... because we have to separate show-ups, so neither of them can speak to each other ... He was walked to the same location, in the direction of the suspect. And once he was able to say yes, that's him, then I *usually* stop and say, 'You are sure.' 'You want to go any closer to make sure?"' It was not necessary, according to Detective Cologne to take Mr. Currer any closer *than the same two car lengths away* that Mr. Francis was brought to.[3]

The detective then went to Mr. Williams, who had been in police custody for hours, to tell him what he was being "charged with" and to explain him his *Miranda* rights. The victims were then brought back to the location they were picked up from by Sergeant Lauri and the other detective. Mr. Williams was transported to the 5th District Station.

When confronted with the private citizen's descriptions of how the show-up was conducted, Detective Cologne contradicted their descriptions of what occurred as to virtually every meaningful detail. She clearly stated that she had no recollection of Mr. Francis stating he couldn't be sure that was the man. In fact, she testified that he never told her that. **She offered that there were *only* eight or nine police cars at the location and only "a *good* fifteen to twenty police officers."**

She said that there was not a "wall" of four police officers standing between Mr. Francis and Mr. Williams and that Mr. Francis never asked for Mr. Williams to be "stood up." The facts adduced at motions and trial demonstrate that Robert Williams was subjected to a warrant-less arrest hours after the robbery, before he was "identified." He was arrested premised upon his allegedly "matching" the description broadcast.

The evidence adduced at trial and in the motion hearings, clearly demonstrate that Mr. Williams did not "match" the broadcast description in many crucial key respects.

3 Det. Cologne says that Mr. Currer's description of how the show-up was conducted was impossible. Rec.V. 2, p. 30, 19, p. 31, 25. In the June 5, 2008 hearing, Cologne agreed that "there has to be something wrong with his (Mr. Currer's) memory.

The victims initially described a "Black make, about 5'9", white, zippered sweatshirt, baggy black jeans." The best description of the clothing Mr. Williams was wearing at the time of his warrant-less arrest is found in Detective Cologne's testimony at trial.

Mr. Francis' original recorded description was "baggy black jeans." Cologne broadcast description was "Black male, light complexion, 5'8" - 5'9", 28-30 years old, 180 pounds, white sweater with 'red writing,' dark baggy jeans."

When she was shown the jeans she confiscated from Mr. Williams, she clearly stated they were not "black." She went on to confirm that the yellow, blue, green and red embroidery on the pants, down the legs; in seam and outer seam, on the rear pockets and upon the fly, had never been mentioned by the victims.

The windbreaker taken from Mr. Williams, had the word "Hustler" on one side of the front in "black with red piping." The victims had described "red writing on the front of the jacket. Additionally, Detective Cologne admitted that neither victim had described the red with dark blue or black piping three inch wide stripe, running down from the collar to the wrist of the coat down each arm. She testified that the red stripe running down the upper portion of each sleeve actually covered a greater portion of the surface of the jacket, than "any writing that appeared in red."

The address the detective listed as Mr. Williams' address, was not the address he gave her. In fact, the detective stated: "The address (on his form) ... was recovered from his last arrest history." The address he would have actually given her on Belfast Street, the FEMA trailer in front of his mother's residence that had not been restored yet, was not listed upon his Rights of Arrestee Form or any report.

The State objected and the trial court sustained the objection, preventing Detective Cologne from informing the jury of the contents of the statement(s) he made to Cologne while he was being interviewed regarding his arrest. She was allowed to say that he "gave her multiple addresses ... *and*

*he also lived with his mom* ..." Subsequent to the court's prohibiting counsel from adducing the entirety of the statements Mr. Williams gave the officer, counsel asked "What investigation did you do of his whereabouts at about the time of the crime?" The court ruled it was irrelevant because "I have not heard any testimony concerning his alleged whereabouts ..."

Detective Cologne confirmed that the victims did not tell her they believed the perpetrator was left-handed or spoke with a stutter.[4] She further reflected that the address she chose to record as Mr. Williams' address was not in the same "neighborhood" as the location the robbery occurred in."

The detective also testified that she noted that Mr. Williams had a "gold tooth." She also confirmed that Mr. Williams had a prominent mole under his left eye and the victims never described the perpetrator as having one.

Incredibly, when asked if Mr. Williams as "a light skinned black man?" the judge refused to allow her to answer that question. This, despite the fact she had been allowed to state the "he matched the description."

Detective Cologne informed the jury that Mr. Williams had neither money or a weapon when he was detained. However, he did have his cell phone and an un-cashed paycheck for nearly six hundred dollars in his pocket.[5]

She informed the jury that in the six months since Mr. Williams gave the State his "Notice of Alibi Defense" that she had done nothing to interview his alibi witnesses.

The defense then called Ms. Bobbie Williams, Mr. Williams' mother. She clearly testified that when she arrived home from work at approximately five minutes after eight in the morning, her son, Robert, was coming in with his friend, Diego. She clearly recalled that it was odd, all the children were home. She was then reminded it was Martin Luther King's Day and there was no school.

---

4 Both victims clearly remembered the robber saying "you don't come into my neighborhood without ...

5 Costal Cargo, Five Hundred and Ninety-Five dollars ($595.00).

She had prepared a large pot of homemade soup the day before and the two men were looking for a bowl of soup on what was an extremely cold January morning. She then fixed everyone in the house soup.

Mrs. Williams then identified the cell phone bill for the phone that was on her son's person when he was arrested. The Judge ruled that the record of usage of the cell phone was irrelevant, despite his being informed that it buttressed the defendant's alibi defense.

Counsel then asked Mr. Williams to recall the call log and text messages and their accompanying time stamps from within the phone in evidence and read them to the jury.

The State once again objected and the court prohibited the jury from receiving the evidence contained in the phone that had been solely in the State's custody from the moment of Mr. Williams' arrest until trial.

Ms. Williams testified that while her son was at her home: "... he wouldn't use his cell phone because he knows between the hours of seven, you pay those calls. If he was going to use it, he would have used the house phone."

Ms. Williams was then asked to identify her son's paycheck that was placed in his property at the time of his booking and later released to his sister. Once again the State objected and the court sustained the objection. Ms. Williams was ultimately allowed to identify the check and it was introduced as D-6.[6]

Ms. Williams then identified her son's clothing and opined that it was his style of clothing. Ultimately, she placed the time her son left the home at "a quarter to 10, 10."

Additionally, she physically identified Lakenia Williams, Alisa Bester, Lashaye Williams and

6 Despite Mr. Williams' name upon it and being taken from his person, the judge maintained that it could be "fraudulent." Ultimately, during a chambers recess, and heated argument, counsel suggested that the issuing company be called to verify his employment. The paymaster verified his employment and the authenticity of the check, the trial court then relented.

Charles Yates, who were all called into open court, as each being at the home during the relevant time period. Each name had been supplied to the State months before the trial. She informed the jury that since her son's arrest, that no one ever came to her house to interview anyone about her son's whereabouts that morning.[7]

Alisha Bester then took the witness stand. She saw Mr. Williams at about 7:00 am that morning at the trailer on her aunt's property and then saw him for the second time at her aunt's home at about 8:30 am. She placed the time she could remember his leaving at approximately 9:25 am.

The defense then rested. The State then informed the court it withdrew its objection to the phone records being entered into evidence. The judge allowed the defense to re-open its case for the limited purpose of introducing the phone bill into evidence.

The State called no rebuttal witnesses, and after a short recess Closing Arguments were held. During the Rebuttal Closing Argument, the prosecutor engaged in conduct that is not allowed:

(1) He entered facts into evidence through his own testimony with respect to the internal electronic records contained within the cell phone, over a direct order by the court that not do so:

MR. GUILLORY: You can do anything on phones. One thing you can do on phones, you can look up the owner information, and you can find the name and phone number for that phone.

The police may have been too lazy to look into the phone, but I wasn't. I looked up the name.

MR. WAINWRIGHT: Excuse me, Your Honor.

THE COURT: Sustained. I am going to have to sustain it if it's – if you are referring to something that's outside the record that hasn't been introduced into evidence.

MR. GUILLORY: The phone's in evidence, Your Honor.

MR. WAINWRIGHT: We weren't allowed –

THE COURT: But wait, wait. Wait, let me apologize. This is very delicate. I have to be very careful and I have to hear from both of you. I am going to sustain the objection at this time. The contents of the phone were not –

MR. GUILLORY: Defense counsel was able to address certain contents –

MR. GUILLORY: Defense counsel was able to address certain contents of the telephone, Your

7 These names were provided to the District Attorney months prior to trial.

| | |
|---|---|
| | Honor. |
| THE COURT: | I don't recall him doing that, sir, with all respect to you. |
| MR. GUILLORY: | The phone was placed into evidence – |
| THE COURT: | I don't recall him during his argument ever mentioning the contents. |
| MR. GUILLORY | During – |
| THE COURT: | I recall him, and I am not commenting on anything other than to explain my ruling. I recall him speaking about the time frame of the gentleman's mother allegedly observing someone maybe use the phone. But, I don't recall any reference to the content of calls being made. And for that reason I must sustain the objection, with all respect to you. |
| MR. GUILLORY: | That's fine. |
| THE COURT: | I note the objection. |
| | I am not saying you are right or wrong. |
| MR. GUILLORY: | I understand, Your Honor. |
| THE COURT: | Just as I have told Mr. Wainwright repeatedly. I am simply saying that I don't think the law allows you to go into this at any point, more particularly at this juncture. That's all I am saying, sir, and I note the objection for you, sir. |
| MR. GUILLORY: | Defense counsel has brought in phone records for a phone with a phone number of 554-0129. The phone records are for Ms. Bobbie Williams' phone. The lady that testified. The phone that was seized was Robert Williams' phone, 554-0129. **These are not the phone records for his phone. That was the first fraud that been place on you today.** |

(2) He entered facts into evidence through his own testimony in the presence of the jury with respect the distance and driving time between "Mr. Williams' residence address" and the scene of the crime, while holding a a Mapquest map in his hand and reading from it.

| | |
|---|---|
| MR. GUILLORY: | **From 1814 Duels Street to Bobbie Williams' house, that's 3.5 miles, you can get there in nine minutes.** But let's keep in mind on this particular day. |
| MR. WAINWRIGHT: | Judge, excuse me. |
| THE COURT: | I am sorry. Yes, sir. |
| MR. WAINWRIGHT: | Facts not in evidence. |
| THE COURT: | The distances you mean, sir? |
| MR. WAINWRIGHT: | The distances and the driving time. |
| THE COURT: | If he's – they are alleging that it's approximately that distance, I believe the law would allow him to say that and allow the jurors to determine if he's accurate or not, based on their knowledge of our city streets. |
| MR. WAINWRIGHT: | You don't think that needed to be introduced during evidence in this case? You can just – |

THE COURT: I accept your position, sir. I note your objection.

MR. WAINWRIGHT: I note my objection and I move for a mistrial.

(3) Additionally, the prosecutor, then used the driving game to argue that if the crime was committed at a different time, than that set forth in the State's Request for Notice of Alibi Defense, that Mr. Williams had time to commit the crime and be home.

MR. GUILLORY: Mr. Currer said this robbery occurred a few minutes after 8, about 8:15 ... So, lets keep in mind now, we are talking about 8:15 ... (sic. with respect to his alibi for 8:30 am) ... So, what's that mean to you? The fact that they said he was there, is that reasonable doubt all of a sudden? No. Because he could very well be there and still have committed that armed robbery, which the state contends he did.

(4) The prosecutor drew the jury's attention to Mr. Williams not having taken the witness stand.

MR. GUILLORY: Only Mr. Williams knows why there was no money or what he did with the gun.

MR. WAINWRIGHT: Excuse me, Your Honor.

THE COURT: Yes, sir.

MR. WAINWRIGHT: As to the comment at this point in rebuttal closing argument. –

THE COURT: Yes sir.

MR. WAINWRIGHT: – that only my client –

THE COURT: I heard the comment, sir.

MR. WAINWRIGHT: knows what he did with the weapon.

THE COURT: Yes, sir.

MR. WAINWRIGHT: I move for a mistrial.

(5) He expressed that if "they" (the District Attorney's Office) had not done sufficient "investigation" into this case *to merit their belief* in the accuracy of the lay witnesses identifications, that he would be "subject to disbarment."

MR. GUILLORY: If we were unsure that this was the person that they have identified before we started this trial, then frankly I'd be getting disbarred because that mean I would be going to trial with someone that I haven't confirmed.

THE COURT: Stop. Wait, stop, please. Wait, I am sorry.

MR. WAINWRIGHT: I think the assertion that the State's going to trial would result in his disbarment is absolutely inappropriate, Judge.

THE COURT: I will overrule that. I am not saying it would lead to his disbarment or not. I believe the law allows him to make the argument. I note the objection.

## FEDERAL QUESTIONS PRESENTED

**1. Did the state courts abuse their discretion when the conviction was obtained with**

**insufficient evidence, which is contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States? *Jackson v. Virginia*; Sixth and Fourteenth Amendments to the United States Constitution.**

**Mr. Williams answers: Yes.**

2. **Was Mr. Williams denied a constitutionally fair and impartial decision by the state court's denial of the Motion to Suppress Identification due to the unreliable, suggestiveness? *Manson v. Brathwaite*; Sixth and Fourteenth Amendments to the United States Constitution.**

   **Mr. Williams answers: Yes.**

3. **Was Mr. Williams prejudiced by the state courts' abuse of discretion with the denial of relief in relation to the prosecutorial misconduct, which is contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States? Sixth and Fourteenth Amendments to the United States Constitution.**

   **Mr. Williams answers: Yes.**

4. **Was Mr. Williams denied effective assistance of counsel during the course of these proceedings? And, did the rulings from the state court result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented (namely, the trial court Judge vouching for the defense counsel during the course of the evidentiary hearing), in the state court proceeding? *Strickland v. Washington*; Sixth Amendment to the United States Constitution.**

   Mr. Williams answers: Yes.

## TIMELINESS OF THIS PETITION

A 1-year period of limitation shall apply to an petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. The limitation period shall run from the latest of (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by state action in violation of the Constitution of laws of the United States is removed, if the applicant was prevented from filing by such state action; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (D) the date on which the

factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence. *28 U.S.C.A. § 2244(d)(1)*. The time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection. *28 U.S.C.A. § 2244(d)(2).* *Artuz v. Bennett*, 121 S.Ct. 361, 531 U.S. 4 (2000); *Carey v. Saffold*, 122 S.Ct. 2134, 536 U.S. 214 (2002).

Although the Courts have remanded this matter twice to the district court, Mr. Williams has timely filed his collateral review in order to have these Issues heard by the Federal Court.

**STANDARD OF REVIEW**

A petition for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in the state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *28 U.S.C.A. § 2254(d)(2)*. *Williams v. Taylor*, 120 S.Ct. 1495, 529 U.S. 362 (2000); *Yarborough v. Alvarado*, 124 S.Ct. 2140, 541 U.S. 652 (2004).

**ISSUES TO BE CONSIDERED**

1. **The trial court erred when it failed to Grant the Motion to Suppress Identification.**
2. **The trial court erred when it denied Mr. Williams' Motion in Liminae, regarding the victim's status as "church volunteers."**
3. **The trial court erred when it refused to allow the defense to adduce the text messages and their time stamps into evidence.**
4. **The trial court erred when it refused to allow Mr. Williams' statements to the arresting officer into evidence.**
5. **The trial court erred when it failed to Grant a Mistrial during Closing Arguments, premised upon improper, inflammatory and unprofessional conduct by the prosecutor**

**in Rebuttal.**

6. **The trial court erred when it did not grant the Motion for Post-Verdict Judgment of Acquittal.**
7. **Defense counsel rendered ineffective assistance prior to, during, and after trial.**
8. **Prosecutorial Misconduct**
9. **The prosecution failed to disclose material impeachment evidence of an alleged eyewitness, Andrew Francis, which undermined the confidence in the reliability of the verdict in violation of *Brady, Giglio, Napue,* and progeny cases in violation of Mr. Williams' rights under the United States Constitution.**

## ARGUMENT(S) OF LAW

### ARGUMENT 1

**The trial court erred with it failed to Grant the Motion to Suppress Identification.**

The Supreme Court has stated that "a claimed violation of Due Process of Law in the conduct of a confrontation depends on the totality of the circumstances surrounding it ..." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199, 1206 (1967). A violation occurs when the procedure is "unnecessarily suggestive and conducive to irreparable mistaken identity." *Id.*

The Due Process requirement takes two steps: First, as a threshold inquiry, the Court must decide whether the identification procedure was unnecessarily suggestive. Second, a finding of impermissible suggestiveness raises concern over the reliability of identification and triggers closer scrutiny by the Court to determine whether such a procedure created a reasonable risk of misidentification. *Id*, at 1112; *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

"... the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned, exigent circumstances, such as 'the interest served by rapid crime solution,' may justify one-on-one confrontations." *Stovall v Denno*, 388 U.S., at 302, 87 S.Ct., at 1972; *Allen v. Estelle*, supra at 1112-13.

Under *Stovall v. Denno*, pretrial identification procedures "unnecessarily suggested and conducive

to irreparable mistaken identification" may violate Due Process without regard to the right to counsel. Fourth and Fourteenth Amendments to the United States Constitution; Louisiana Constitution of 1974, § 2, 5.

When the police in effect suggested that "This is the man," or indicate to the witness that the man in custody ***is the man the police believe to have committed the crime***, are both classic examples of impermissible suggestiveness. See: ***Foster v. California***, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402, 407 (1969); ***Crume v. Beto***, 383 F.2d 36, 39 (CA5 1967), *cert. denied*, 395 U.S. 964, 89 S.Ct. 2106, 23 L.Ed.2d 749 (1969).

**Louisiana Jurisprudence**

Generally, the defendant has the burden of proof on a Motion to Suppress an out-of-court identification. La C.Cr.P. Art. 703 (D). To suppress and identification, a defendant must first prove that the identification procedure was suggestive and that there was a substantial likelihood of misidentification as the result of the identification procedure. ***State v. Leger***, 2005-0011, p. 59, (La. 7/10/06), 936 So.2d 108, 151, *cert. denied*, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2/20/07), citing, ***State v. Higgins***, 2003-1980, p. 19 (La. 4/1/05), 898 So.2d 1219, 1232-33.

Given the evidence introduced during the motions hearing and trial, Mr. Williams submits he has me his burden of proof to establish that the identification itself was suggestive and that there was substantial likelihood of misidentification as a result of the identification procedure. ***State v. Gurley***, 565 So.2d 1055, 1062 (La. App. 4th Cir. 1990), *writ denied*, 575 So.2d 386 (La. 1991); citing ***State v. Smith***, 499 So.2d 340 (La. App. 4th Cir. 1986), *writ denied*, 503 So.2d 14 (La. 1987).

The law as to identification procedures was recently set out in ***State v. Holmes***, 931 So.2d 1157 (La. App. 4th Cir. 2006):

> "An identification procedure is suggestive if, during the procedure, the witness' attention is unduly focused on the relator. Moreover, a relator who seeks to suppress an identification must

prove both that the identification itself was suggestive and that a likelihood of misidentification existed as a result of the identification procedure.

The Supreme Court has held that even if the identification could be considered suggestive, it is the likelihood of misidentification that violates Due Process, not merely the suggestive identification procedure. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. If a suggestive identification procedure has been proved, a reviewing court must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents the substantial likelihood of misidentification at trial.

The U.S. Supreme Court has set forth a five factor test to determine whether a suggestive identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness's prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. The corrupting effect of the suggestive identification itself must be weighed by these factors. ***Manson v. Brathwaite***, supra.; ***Neil v. Biggers***, supra.

In *State v. Bickman*, 404 So.2d 929, 934 (La. 1981), the Court said:

> "One-on-one confrontations between a suspect and a victim, while not favored by the law, are permissible when justified by the overall circumstances. **Such identification procedures are generally permitted when the accused is apprehended within a short time after the offense and is returned to the scene of the crime for on-the-spot identification.** A prompt in-the-field identification, under appropriate circumstances, promotes accuracy, as well as expediting the release of innocent suspects. **(emphasis added).**

In evaluating the propriety of an identification procedure, the reviewing court may consider all pertinent evidence adduced at the trial; as well as, at the hearing on the Motion to Suppress the Identification. A trial court's determination on the admissibility of identification evidence is entitled to

great weight and will not be disturbed on appeal in the absence of an abuse of discretion. ***State v. Offray***, 797 So.2d 764 (La. App. 4th Cir. 2001).

Consequently, the trial court, in this matter committed constitutional error in allowing the State to elicit testimony predicated upon the "identifications" made at this tainted procedure. The State never presented ***one scintilla of evidence*** how Mr. Williams came into police custody or how many hours he was "detained" prior to being exhibited, during the motions hearing or the trial. Further, since the State presented no evidence to prove that this error was ***harmless beyond a reasonable doubt*** under the teachings of ***Chapman v. California***, 386 U.S. 17, 18 S.Ct. 824, 17 L.Ed.2d 705 (1967), this conviction must be set aside.

The trial court was erroneous when it opined that: "the issues presented by both sides are subject to review by the trier of fact." Mr. Williams avers that the constitutionality of a show-up procedure **conducted hours after the crime** at a location **other** than the crime scene or nearby, are submitted to juries for their determination regarding whether the actions of the police meet Due Process concerns.

**ARGUMENT 2**

**Denial of Motion in Liminiae regarding the victims' status as "church volunteers."**

Prior to jury selection, Mr. Williams moved, pursuant to the relevant articles of the Code of Evidence, that the victim's status as "church volunteers" be excluded. This motion was made as the status of being "church volunteers" was not relevant to their ability to testify as to their perception and recollection of the events.

Further, Mr. Williams asserted that the prejudicial impact of having the testimony be buttressed by the mens' status as "Christians" and their desire to help New Orleans rebuild outweighed the marginal, if any relevance, their status had.

***Relevant Evidence Defined:***

LSA-C.E. Art. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

LSA-C.E. Art. 403 states that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

The trial Judge determines whether evidence is relevant by deciding whether it bears a rational connection to the fact which is at issue in the case. *State v. Scales*, 655 So.2d 1326 (La. 1995).

In this matter, not only did the trial court judge make an erroneous ruling, he ruled "for himself" on appeal, stating: "***The Court finds*** its ruling is not an abuse of discretion and notes and objection for the defense ..." (**emphasis added**).

## ARGUMENT 3

**The trial court erred when it refused to allow the defense to adduce the text messages and their time stamps into evidence.**

La.C.Cr.P. Art. 727 requires that, upon proper written demand by the State, the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi. The purpose of such notice-of-alibi provisions is to allow the State sufficient notice of the defendant's intention to present an alibi defense, to avoid unfair surprise at the trial.

On May 8, 2008, Mr. Williams took the witness stand in open court and informed the State who his alibi witnesses were and where he was on January 21, 2008, at 8:30 am, the recorded time of the offense.

The record of the phone calls made and the time text messages were sent buttressed Mr. Williams' alibi defense. Further, the contents of the text messages showed a man concerned with the welfare of

his children and friends and the status of his relationship with a friend. Just like his phone calls, they stopped and then began, bracketing the time period he was at his mother's according to his alibi witness.

Prohibiting Mr. Williams from introducing then internal records from the cell phone prejudiced him in two manners: (1) The internal call record could have and would have been "matched" to the "call log" provided by the cellular provider, thus foreclosing the bizarre and improper Rebuttal Closing Argument by the prosecutor; and, (2) it prevented Mr. Williams from being able to demonstrate to the jury that shortly before and after the robbery he was alleged to have committed, that he was texting **love messages** to his girlfriend.

## ARGUMENT 4

**The trial court erred when it refused to allow Mr. Williams' statements to the arresting officer into evidence.**

In *State v. Gremillion*, 542 So.2d 1074 (La. 1989), the Court held that an otherwise inadmissible hearsay statement which does not fit into one of the recognized exceptions to the hearsay rule should be admitted if it is reliable and trustworthy and to exclude it would interfere with defendant's constitutional right to present a defense. In *State v. Martin*, 582 So.2d 306 (La. App. 1st Cir. 1991), *writ denied*, 588 So.2d 113 (La. 1991), the Court found that "even if the Louisiana Code of Evidence prohibits the introduction of certain testimony, in those rare cases where the evidentiary rule impermissibly impairs the defendant's right to present a defense, the evidence still should be admitted."

also pertinent are:

**R.S. 15:449 Applicability**
The term "admission" is applied to those matters of fact which do not involve criminal intent; the term "confession" is applied only to an admission of guilt, not an acknowledgment of facts merely tending to establish guilt.

**R.S. 15:450 Use of confession, admission or declaration in entirety.**
Every confession, admission or declaration sought to be used against any one must be used in

its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.

In this matter, there was only one "interview" conducted with Mr. Williams by the NOPD. The trial court allowed into evidence an incomplete and negatively slated version of the conversation, then precluded Mr. Williams from adducing the entirety of the conversation.

The cases cited by the trial court, are not opposite. Each addresses multiple statements, some inculpatory, some exculpatory, **made hours or days apart**. Neither, is actually on point; i.e., addressing the State's having to present the entirety of the accused statements given in a single interview. See: *State v. Guillory*, 373 So.2d 133, *McDonald*, 387 So.2d 1116, and *Hill*, 610 So.2d 1030; *Washington*, 540 So.2d 502. These are the cases cited before the jury by the judge verbatim. None authorized the exclusion of the accused citizen's initial interview with the police.

The detective stated "... he gave multiple addresses ..." and the court prohibited her accurately recounting what Mr. Williams told her about where he lived and what he stated in response to the assertion he committed an Armed Robbery while he was at his mother's eating soup.

## ARGUMENT 5

**The trial court erred when it failed to Grant a Mistrial during Closing Arguments, premised upon improper, inflammatory and unprofessional conduct by the prosecutor in Rebuttal.**

Mr. Williams has extensively set forth the content and the nature of the misconduct that took place during Rebuttal Argument in the **Statement of the Facts**, supra. The trial court judge heard the State's Rebuttal Argument and the direct violation by the State of his rulings. He heard, that the prosecutor move the time of the offense, introduce distance and driving times and the prosecutor saying "he wasn't 'too lazy' ... to turn on the cell phone and look at the electronic records contained therein."

At each a timely made objection was recorded. With respect to "turning on the cell phone," the defense objection was sustained. However, the prosecutor went ahead and "gave the evidence."

It all seemingly meant nothing to the trial court judge, these church volunteers had been wronged and Mr. Williams had "been identified" and it was all "up to the jury."

## ARGUMENT 6

**The trial court erred when it did not Grant the Motion for Post-Verdict Judgment of Acquittal.**

When the convicted citizen raises the sufficiency of the evidence and one or more trial errors, the court must first determine the sufficiency of the evidence. La.C.Cr.P. Art. 821 provides that a Motion for Post-Verdict Judgment of Acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the State, does not reasonably permit a finding of guilty. This is a question of legal sufficiency.

The reason for reviewing the sufficiency of the evidence first is that the accused may be entitled to an acquittal under ***Hudson v. Louisiana***, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with ***Jackson v. Virginia***, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have not been proven beyond a reasonable doubt. ***State v. Hearold***, 603 So.2d 731 (La. 1992).

In cases such as this, involving a defendant's claim that he was not the person who committed the crime, the ***Jackson*** rationale requires the State to negate any reasonable probability of misidentification in order to carry its burden of proof. ***State v. Brady***, 414 So.2d 364 (La. 1982).

One of the reasons for accused citizens being required to give ***Notice of their Alibi Defense***, is that in a just and properly administered justice system, someone; either the police or the District Attorney, would actually take the responsibility to investigate and verify the validity of the proffered alibi. This didn't take place in this matter.

The judge had an independent responsibility to assess the evidence in a neutral and detached

manner ***prior to trial***, he failed to do so. He then "punted" on his post-trial responsibilities as the "thirteenth juror." He overlooked the fact that Mr. Williams was convicted by a non-unanimous jury and basically opined the evidence was good enough ***for twelve citizens***, that makes it good enough for me.

It is obvious in this matter that once the trial court judge ruled that the constitutionality of Mr. Williams' arrest and detention for hours prior to the identification would be submitted "to the jury" ***all bets were off*** regarding whether or not Mr. Williams would be afforded full ***Due Process of Law*** in this case.

Though a reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or part, it is not categorically bound. This is particularly true when there is internal contradiction and irreconcilable conflict between the witnesses accounts of the identification procedure and admission that Mr. Williams was not a "light skinned black man."

**ARGUMENT 7**

**Defense counsel rendered ineffective assistance prior to, during, and after trial.**

A defendant has a constitutional right to effective assistance of counsel which is guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution of 1974. The standard of review for evaluating such constitutional claims as effective assistance of counsel was established by the United States Supreme Court in ***Strickland v. Washington***, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 647 (1984).

To prevail on an ineffective assistance of counsel claims according to ***Strickland***'s standard, "a Petitioner must demonstrate that: (1) counsel's performance was deficient; and, (2) counsel's deficient performance prejudiced the outcome of the trial." *Id.*

As to the first prong, to determine whether an attorney's conduct was deficient, "[t]he court … must

determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." ***Strickland***, at 690. The second prong of the ***Strickland*** standard requires the Petitioner to show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Strickland***, at 694. Furthermore, the ***Strickland*** Court determined that "a reasonable probability is a probability sufficient to undermine confidence in the outcome."

The question of ineffective assistance of counsel is a **cumulative** one. It is not proper to divide each issue up in an effort to "conquer" it; rather, this Court must review the totality of the circumstances and the cumulative effect of defense counsel's lapses. ***Strickland v. Washington***, supra. (when reviewing counsel's effectiveness, court must look to "all circumstances" of the trial). Therefore, all of the issues discussed below must be viewed in their cumulative context, rather than in isolation.

*A. Defense Counsel Failed to Prepare and Perform Proper Pretrial Discovery, Investigation, and Interview of Witnesses:*

Defense counsel **must** engage in a reasonable amount of pretrial investigation, and "at a minimum … make and independent investigation of the facts and circumstances of the case." ***Nealy v. Cabana***, 764 F.2d 1173, 1177 (5th Cir. 1985). In general, defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." ***Strickland***, 466 U.S., at 669. See: ***Sanders v. Ratelle***, 21 F.3d 1446, 1456 (9th Cir. 1994)("[c]ounsel must, at a minimum, conduct a reasonable investigation enabling him to represent his client.").

First, to support this claim, Mr. Williams submits that defense counsel Wainwright failed to visit him and communicate in order to adequately prepare his case. This is ineffective assistance under the standards of ***Strickland***, supra. Mr. Williams further submits that Mr. Wainwright obviously has a history of this type of conduct because he has been sanctioned by the Louisiana Supreme Court for the same type of conduct. See: Louisiana Supreme Court Order issued June 29, 2012: ***In re: Charles Gary***

*Wainwright*, No. 2012-B-1392.

Next, a review of the record clearly reveals that Mr. Wainwright failed to perform adequate pretrial discovery, investigation, and interview witnesses, and this is critical to any defense.

In the instant case, Mr. Wainwright failed to interview potential defense witnesses, failed to interview two eyewitnesses, and failed to investigate phone records, which are fundamental duties. Mr. Williams submits that the failure to interview eyewitnesses is grossly ineffective. *Anderson v. Johnson*, 338 F.3d 382, 391 (5th Cir. 2003)(quoting *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994).

Mr. Wainwright failed to investigate and subpoena Mr. Williams' phone records. Counsel was well aware that Mr. Williams' cell phone was confiscated and placed in the NOPD Property Room when he was arrested. Despite that, counsel failed to subpoena the cell phone records. Counsel was aware that Mr. Williams made several "calls and texts" close to the time of the incident (Vol. 1, p. 31, lines 8-19). These calls and texts buttressed Mr. Williams' alibi and would have proven that Mr. Williams was in another location at the time of the crime charged.

Moreover, counsel should have known that the phone was "useless" without the records. These records were crucial to the defense. Counsel was grossly ineffective for his failure to file the necessary motion to have a subpoena issued to Verizon Wireless to produce the pertinent records. Mr. Williams avers that cell phone technology has been used to include and exclude suspects involved in crime. This is a quintessential example of deficient performance and his actions were far from reasonable. *Strickland* supra: *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986)(finding that deficient performance where counsel failed to conduct pretrial discovery and that failure "was not based on 'strategy,' but on counsel's mistaken believe that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense).

Counsel was gravely mistaken in believing that the phone alone could be used as demonstrative

evidence on behalf of the defense. As a result of his failures, no foundation was laid to demonstrate the use of the phone. Therefore, allowing passage of some damaging argument from the prosecutor (Vol. 2, p. 6, p. 135, lines 9-16; p. 137, lines 11-17). This failure was highlighted by the Court's ruling wherein the Court stated in the presence of the jury that the phone was irrelevant (Vol. 2. pp. 66-73). Mr. Williams avers that competent counsel would have acquired the cell phone records for use with the phone. Had the records been presented to the jury, they would have derived that Mr. Williams **can not be in two places at one time**. There is more than a reasonable probability that this would have changed the outcome of the proceedings. This was not based upon strategy.

On June 5, 2008, Alisa Bobbie Bester informed counsel that Katie Mears appeared to testify at Mr. Williams' trial (see: 17 and 18 of Stuart M. Weg's February 20, 2014 Affidavit). Ms. Mears indicated to counsel, as well as Investigator, Emily Zolynsky, that she was willing to testify to facts regarding the identification of Mr. Williams identification as the perpetrator. It would have been Ms. Mears' testimony that Mr. Francis told her - - **that he was uncertain of the identification and that he had been steered by the police into identifying Mr. Williams**.

An interview of the eyewitness/victim, Andrew Francis, would have revealed to counsel: "At the time, I was not sure if the suspect was the perpetrator, but Paul's certainty reassured me. I informed the officers I was not 100 % sure if the suspect was the perpetrator. That same day, Paul informed me that he was a retired Central Intelligence Agency analyst. He further stated that facial recognition was one of his specialties. The nature of this information and Paul's identification of the suspect allowed me to reconcile some of the doubt I had. At a point later in the summer, I spoke with Mr. Guillory (ADA) about possible not testifying. Mr. Guillory informed me that if I refused to testify, that they would fly up to Iowa, arrest me, and bring me back to New Orleans. Facing the possible arrest had a bearing on my decision to return to New Orleans and testify at the trial" (See: Exhibit "G").

Under the circumstances, any competent lawyer with knowledge of the listed information would have acted. For instance, upon receiving the information from Mr. Williams, Mr. Weg assigned his investigator the task to conduct a follow-up of the information. Once investigator, Emily Zolynsky, learned from Ms. Mears that the identification was flawed, Ms. Zolynsky expressed a strong desire to contact and interview Andrew Francis. The only reason Ms. Zolynsky did not interview Mr. Francis was that he was in India and would not be available until December of 2011 (See: Exhibit "B").

The eyewitness identification was the sole issue. There was no physical evidence introduced in this case. Counsel knew the seriousness of the offense and the gravity of the punishment; and even if counsel's decision not to subpoena Ms. Mears was a scintilla strategic, it was highly unreasonable and highly prejudicial. Moreover, Andrew and Paul testified to divergent descriptions of the perpetrator. Even the description broadcast on the radio did not match Mr. Williams. Put another way, there were three different descriptions and counsel still failed to introduce any documented evidence to Mr. Williams' height, weight, and skin complexion, leaving the jury to guess.

The documented evidence to Mr. Williams' height, weight, and skin complexion was never presented to the jury. Since the identification was the sole issue in this case, and the descriptions of the perpetrator led the officers to Mr. Williams, it was unreasonable for counsel not to show the jury, through documented proof, that Mr. Williams was 5'9," weighed 135 pounds, with a dark brown complexion. Mr. Williams "**did not**" weigh 160 pounds, and definitely "**did not**" weigh 200 pounds. Moreover, Mr. Williams informed counsel, by letter, detailing the noticeable distinctions on the clothing Mr. Williams was wearing; and also informed counsel of the several vastly different physical distinctions between Mr. Williams and the actual perpetrator. Yet, counsel did no further investigation.

During the motion hearing, the following colloquy ensued between Mr. Andrew Francis and defense counsel:

Q: When you talked to Amanda and Katie, other than saying you had been mugged, did you give them a description of the person who robbed you?

A: I did not.

Q: So you just said I've been mugged and they told you to meet them at McDonald's?

A: Correct. (motion hearing April 9,p. 11, lines 28-31; p. 12, lines 1-3).

Defense counsel first leaned of Katie Mears during this motion hearing, yet counsel still failed to investigate and interview Ms. Mears to ascertain what was communicated by Andrew and Paul to Ms. Mears. Ms. Mears heard the description provided by Mr. Francis to the NOPD. The description provided was of a younger black male wearing a white hoodie and jeans (See: Exhibit). This description differs from the description provided by Mr. Francis during testimony.

Moreover, although Mr. Francis **was not positive in his identification and had been steered, or manipulated to Identify Mr. Williams** (See: Exhibit). Ms. Mears was the first to speak with Mr. Francis and Mr. Currer immediately after the incident. In fact, Ms. Mears called 911 to report the robbery (motion hearing, April 9, p. 4, lines 27-32; p. 5, lines 1-2: See: Affidavit of Attorney Stuart Weg dated February 20, 2014).

Counsel's failure to interview Ms. Mears was fatal. Counsel missed the opportunity to bring out that from day one Mr. Francis knew that Mr. Williams was not the perpetrator, yet was influenced to identify Mr. Williams. Moreover, because of counsel's failure, counsel failed to learn that the description initially given by Mr. Francis did not match Mr. Williams. Counsel's failure to interview Ms. Mears was not only ineffective, but also deprived the defense of counsel to put the State's case to adversarial testing and confront and cross-examine the witnesses against him. The cumulative effect of trial counsel's errors deprived Mr. Williams his fundamental right to a fair trial by undermining confidence in the jury's verdict.

Under the above circumstances, it was wholly unreasonable for counsel not to interview the person

who first spoke to the witnesses after the robbery. Counsel learned at the motion hearing that Ms. Mears was associated with the incident because Mr. Francis and Mr. Currer called her immediately thereafter. By the time Alisa and Bobbie Bester informed counsel of their encounter in court, it should have alerted counsel to investigate and interview this pertinent witness. No competent counsel would have disregarded an interview with Ms. Mears and there is no strategy involved in such a decision.

There can be no doubt that had defense counsel performed adequate pretrial investigation, discovery, interviewed and called witnesses, there is more than a reasonable probability that the outcome would have been different. The State's strategy was to link Mr. Williams to the incident through the use of eyewitness testimony. Counsel attempted to counter the State's strategy by showing the jury that the witnesses were mistaken in their identification of Mr. Williams. Had he performed adequate pretrial investigation, discovery, interviewed and called witnesses, he would have had the necessary facts to impeach these witnesses and the outcome would have been different.

Mr. Williams avers that defense counsel fell woefully short of the range of competency demanded of attorneys in criminal cases enunciated in *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 14441, ___ L.Ed.2d 763 (1970). The United States Supreme Court recognizes defendant's rights to a lawyer who is within the range of competence, the *McMann* definition of effective counsel, and recently expressed the requirement of a "competent attorney." *State v. Berry*, 430 So.2d 1005, 1007 (La. 4/4/83) (citing *Engle v. Issac*, 456 U.S. 197 (1982).

Mr. Williams avers, and the record indicates, that defense counsel's failure to perform adequate pretrial discovery, investigation, and interview of witnesses resulted in the denial and deprivation of Due Process, the right to a fair and impartial trial, the right to present a defense, and the right to effective assistance of counsel, violative of his Fifth, Sixth and Fourteenth Amendments to the United States Constitution and his rights under the Louisiana Constitution of 1974. Mr. Williams avers this

mandates reversal, or in the least, a full and fair evidentiary hearing wherein Mr. Williams' claims can be presented and argued with testimony from witnesses to support his viable claims.

*B. Defense Counsel Failed to Present a Defense:*

The Sixth Amendment of the United States Constitution guarantees the right to present a defense. Sixth Amendment to the United States Constitution; Louisiana Constitution of 1974, Art. I, § 16; *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *State v. Van Winkle*, 658 So.2d 198 (La. 1995); *State v. Gremillion*, 542 So.2d 1074 (La. 1989); *State v. Vigee*, 518 So.2d 501 La. 1988).

As argued above, defense counsel was grossly ineffective for his failure to visit and communicate with his client, and he failed to perform adequate pretrial discovery, investigation, and interview of witnesses. In the case sub judice, the facts presented indicate that there was a misidentification.

The facts and law plead by Mr. Williams display that counsel was grossly ineffective and the trial court abused its discretion. Mr. Williams submits that the identification is severely flawed and the Court has denied him motions erroneously. Counsel is a licensed and experienced attorney, and **presumed to know the law**, Mr. Williams avers that counsel was aware, or should have been aware of the standard enunciated in *Neil v. Biggers*, 409 U.S. 188, 196, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972), and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977).

Mr. Williams submits that the record displays that counsel **failed to do the obvious** when he had the tools to prepare and present a viable defense. Counsel's performance was so lacking that it was like having no counsel at all. This virtually amounts to a constructive denial of counsel.

Mr. Williams was entitled to an identification procedure untainted by suggestiveness and/or coercion conducive to mistaken identification. The Fifth and Fourteenth Amendments to the United States Constitution, and Louisiana Constitution of 1974, Art. I § 3, 12, 13, and 16. *Kirby v. Illinois*, 406

U.S. 682, 92 S.Ct. 1887 (1972). It is the likelihood of a misidentification which violates Due Process, not merely the suggestive identification procedure. *Manson*, supra; *State v. Guillot*, supra; *Neils v. Biggers*, supra. As a result of counsel's utter failures, Mr. Williams had no defense when he had a viable defense at hand. As a result of counsel's failures, he was subjected to identification procedures contrary to that enunciated in the above well established jurisprudence.

Counsel was informed and aware of the cell phone calls and texts, and he was informed and aware of Ms. Mears. Counsel failed to file the necessary motions to have a subpoena issued to acquire the pertinent cell phone records. These records were crucial to Mr. Williams' alibi defense and supported the testimony of Alisa and Bobbie Bester. Counsel failed to utilize available evidence and testimony to present Mr. Williams' viable defense.

For all that appears from the record, counsel **inexplicably failed** to recognize the significance of, and did not contemplate for the defense, facially exculpatory, demonstrative evidence. With such information available, and counsel fails to utilize said information, it is a Constructive Denial of Counsel and under the circumstances presented, is no counsel at all. **This is constitutionally defective representation under the Sixth Amendment to the United States Constitution and Art. I § 13 of the Louisiana Constitution of 1974**; *Bridges v. Florida*, 466 So.2d 348 (Fla. App. 1983).

Mr. Williams was denied the constitutional right to present a defense as a result of counsel's ineffective assistance. Counsel's failures had such an adverse effect on the defense that there was no defense. Counsel's errors resulted in the denial and deprivation of Due Process, the right to a Fair and Impartial trial, the right to present a defense, and the right to effective assistance of counsel, violative of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to the United States Constitution. Mr. Williams submits that this mandates reversal, or in the least, a full and fair evidentiary hearing wherein Mr. Williams' claims can be presented and argued with testimony from witnesses to support his viable

claims.

*C. Cumulative Errors Denied Mr. Williams a Fair and Reliable Trial:*

In *Taylor v. Kentucky*, 436 U.S. 478, 487, NO. 15, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), the Court accepted the notion that several errors, none of which individually rise[s] to constitutional dimensions, may have the **cumulative** effect of denying a defendant a fair trial. Indeed, in *Taylor*, the Court reversed a state conviction upon a finding that "the cumulative effect of the potential damaging circumstances of the case violated the Due Process guarantee of fundamental fairness …" In the case sub judice, this is exactly what occurred. Counsel's performance was deficient prior to and during trial. Counsel failed to communicate with his client and prepare. He failed to perform adequate pretrial discovery, investigation, and interview witnesses. He failed to prepare and present a defense when there was a viable defense at hand, and utterly failed to put the State's case to adversarial testing.

The Supreme Court held in *Kyles*, supra, that a reviewing court must consider the cumulative effect of all errors together as a whole rather than evaluating each error against the other admissible evidence in order to determine if there is a reasonable probability that the errors complained of might have effected the outcome. *Kyles*, at 1577, 1578; *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 So.2d 481 (1985).

Counsel's actions and/or in-actions resulted in denial and deprivation of Due Process, right to a fair and impartial trial, the right to present a defense, and the right to effective assistance of counsel, violative of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution. There can be no doubt that had counsel provided effected representation, there is more than a reasonable probability that the outcome of the trial would have been different. Combined, the plethora of counsel's error had a"cumulative" effect and reversal of Mr. Williams' conviction and sentence is warranted.

## ARGUMENT 8

**Prosecutorial Misconduct**

Mr. Williams submits that the improper, prejudicial, and inflammatory comments made by the ADA during Closing Argument were not confined to the facts and evidence, based upon his personal opinion and beliefs, and made solely for the purpose of appealing to the emotions of the jury and prejudicing the jury against the accused.

Closing Arguments that vouch for the defendant's guilt are beyond ethical bounds and when combined with all of his other prejudicial ploys, compounds the problem. Mr. Williams avers that a review of ADA Guillory's Closing Argument leaves no doubt that he made improper remarks/suggestions of personal opinion, vouched for the defendant's guilt, and improperly inflamed the biases, passions, and prejudices of the jury. Indeed, Guillory's hyperbolic argument crowned his strategy of pillorying Mr. Williams before the jury. Guillory's comments tainted the jury and resulted in substantial prejudice to Mr. Williams by denying him a fair and impartial trial.

In addition to improper comments, Guillory entered facts into evidence through is own testimony with respect to the electronic records contained within the cell phone over direct order from the Court that he not do so.

GUILLORY: You can do anything on phones. One thing you can do on phones, you can look up the owner information, and you can find the name and the phone number for that phone.

WAINWRIGHT: Excuse me, Your Honor.

THE COURT: Sustained. I am going to have to sustain it if its - - if you are referring to something that's outside the record that hasn't been introduced into evidence.

GUILLORY: The phone's in evidence, Your Honor.

WAINWRIGHT: We weren't allowed - -

THE COURT: But wait, wait. Wait. Let me apologize. This is very delicate. I have to be

very careful and I have to hear from both of you. I am going to sustain the objection at this time. The contents of the phone were not - -

GUILLORY: Defense counsel was able to address certain contents - -

GUILLORY: Defense counsel was able to address certain contents of the telephone, Your Honor.

THE COURT: I don't recall him doing that, sir, with all respect to you.

GUILLORY: This phone was placed into evidence - -

THE COURT: I don't recall him during his argument ever mentioning the contents.

GUILLORY: During - -

THE COURT: I recall him, and I am not commenting on anything other than to explain my ruling. I recall him speaking about the time frame of the gentleman's mother allegedly being in the house with him, but - - and perhaps observing someone maybe use the phone. But I don't recall any reference to the contents of the calls being made. And for that reason, I must sustain the objection, with all respect to you.

Guillory entered facts into evidence through his own testimony in the presence of the jury with respect to the distance and driving time between Mr. Williams' residence and the scene of the crime, while holding a map in his hand and reading from it.

GUILLORY: From 1814 Duels Street to Bobbie Williams' house, that's 3.5 miles, you can get there in nine minutes. But let's keep in mind on this particular day - -

WAINWRIGHT: Judge, excuse me.

THE COURT: I'm am sorry. Yes, sir.

WAINWRIGHT: Facts no in evidence.

THE COURT: The distance you mean, sir?

WAINWRIGHT: The distance and driving time.

THE COURT: If he's - - they are alleging that it's approximately that distance, I believe the law would allow him to say that and allow the jurors to determine if he's accurate or not, based on their knowledge of our city streets.

WAINWRIGHT: You don't think that needed to be introduced during evidence in the case?

THE COURT: I accept your position, sir. I note your objection.

WAINWRIGHT: I note my objection and I move for a mistrial.

Guillory then used the driving time to argue that if the crime was committed at a different time than that set forth in the State's request for notice-of-alibi defense, that Mr. Williams had time to commit the crime and be home.

GUILLORY: Mr. Currer said this robbery occurred a few minutes after 8, about 8:15 ... So, let's keep in mind now, we are talking about 8:15 (sic with respect to his alibi for 8:30 am) ... So, what's that mean to you? That fact that they said he was there, is that reasonable doubt all of a sudden? No. Because he could very well be there and still have committed that Armed Robbery, which the State contends he did.

Guillory drew the jury's attention to Mr. Williams not having taken the witness stand.

GUILLORY: Only Mr. Williams knows why there was no money or what he did with the gun.

WAINWRIGHT: Excuse me, Your Honor.

THE COURT: Yes, sir.

WAINWRIGHT: As to the comment at this point in rebuttal closing argument - -

THE COURT: Yes, sir.

WAINWRIGHT: That only my client - -

THE COURT: I heard the comment.

WAINWRIGHT: Knows what he did with the weapon.

THE COURT: Yes, sir.

WAINWRIGHT: I move for a mistrial.

Mr. Williams submits that the repeated improper comments and misrepresentation of the evidence permeated the entire atmosphere of the trial, effectively depriving Mr. Williams of a fair trial. ***United***

States v. Wyly, 193 F.3d 289, 299 (5th Cir. 1999). Guillory's improper comments/suggestions, insinuations, and misrepresentation of evidence was profound and infected the trial with unfairness, denying Mr. Williams the right to a fair trial. Greer v. Miller, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). Guillory offered unsolicited personal views on evidence not in the record. Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony. Guillory's comments were persistent, made throughout the trial, and flagrant. This is not a case where the prosecutor slipped and made one remark.

The Fifth Circuit looks to three factors in deciding whether any misconduct casts serious doubt on the verdict: (1) the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and, (3) the strength of the evidence supporting the conviction. Mares, 403 F.3d at 515 (quoting United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1994).

Mr. Williams submits that the prejudicial effect of the prosecutor's repeated remarks was severe; he entered evidence not in the record. The trial judge's failure to give adequate cautionary instruction to was insufficient, and the strength of the evidence supporting the crimes charged was lacking.

Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury might draw from it and impermissible practice of arguing suggestions beyond the evidence. Houston v. Estelle, 569 F.2d 372, 380 (5th Cir. 1978). These comments were for no other purpose than to create an insurmountable degree of prejudice in the minds of the jurors and appeal to their emotions. These comments **were not** supported by the evidence.

These **repeated** comments were heard by the fact finding jurors and the prejudice from the repeated comments was insurmountable. "A drop of ink cannot be removed from a glass of milk." Government of Virgin Islands v. Toto, 529 F.2d 278, 283 (3rd Cir. 1976); "[O]ne cannot un-ring a bell,' 'after the thrust of the saber, it is difficult to say, forget the wound,' and finally, 'if you throw a skunk into a jury

box, you can't instruct the jury not to smell it.'" Dunn v. United States, 307 F.2d 883, 886 (5th Cir. 1962).

While not expressly forbidden by statute, an attorney may not argue his personal opinion as to the credibility of the witness or the guilt or the innocence of the accused. State v. Brown, 313 So.2d 581 (La. 1975); State v. Phillips, 337 So.2d 1157 (La. 1976); State v. Kaufman, 304 So.2d 300 (La. 1974).

The justification of this rule is that an expression of personal opinion diverts the jury from considering the case solely on the basis of the evidence or lack of evidence presented. State v. Kaufman, supra. In this case, Guillory's expression of opinion was not based upon matters in evidence. The cumulative effect of errors committed by the prosecutor and Judge denied Mr. Williams a fair trial. United States v. Diharce-Estrada, 526 F.2d 637, 640 (5th Cir. 1976); Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

The conviction and sentence in this case must be reversed based on the prosecutor whose primary objective was apparently to convict at any cost, rather than subject the case to the truth seeking process. Mr. Williams was deprived of any hope of a fair trial, and denied Due Process and Equal Protection of the Law.

## ARGUMENT 9

**The prosecution failed to disclose material impeachment evidence of an alleged eyewitness, Andrew Francis, which undermined the confidence in the reliability of the verdict in violation of Brady, Giglio Napue, and progeny cases in violation of Mr. Williams' rights under the United States Constitution.**

*1. The Brady Rule:*

The suppression of evidence favorable to an accused by the prosecution when requested violates Due Process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). As the Supreme Court later clarified, there are three components to a true Brady violation:

(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State either willfully or inadvertently; and, (3) prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

Evidence is material so as to establish prejudice only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 662, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Of course, *Brady* and its progeny apply only to evidence possessed by the prosecution team, which includes both investigative and prosecutorial personnel. *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989).

Mr. Williams' family hired an investigator, Mosi Mokari, on March 6, 2013. The purpose of the investigation was to interview Kate Mears and Andrew Francis (See: Exhibit). Mr. Mokari had located and interviewed Mr. Francis. Mr. Francis now reveals in a sworn Affidavit, some startling facts which were not known to Mr. Williams or counsel (See: Exhibit).

More importantly, the Affidavit reveals that the prosecutor know of the information, but failed to disclose it to the defense (See: Exhibit). Instead, the prosecutor engaged in skullduggery – threatened to arrest Mr. Francis if he did not testify against Mr. Williams (See: Exhibit).

Here, Mr. Francis was a prosecution witness who claimed to have been robbed. Several hours after the incident, Mr. Francis identified Mr. Williams as the perpetrator. During the motion hearing on April 9, 2008, Mr. Francis testified that he was not forced, threatened, or coerced in his identification of Mr. Williams, or to testify. During the motion hearing, the following colloquy between defense counsel and Mr. Francis:

Q: Now, did any of the officers promise you anything of value for saying that the guy that they were presenting to you was the person?

A: No.

Q: Did they force you in any way to select him?

A: No.

Q: Did they suggest to you that you should select him?

A: No.

(Motion hearing, April 9, at p. 8, lines 20-28).

The prosecutor felt the need to establish before the Court that Mr. Francis made a positive identification, and his testimony was a result of his own free will and observation. The non-disclosed evidence goes to the core of Mr. Francis' credibility. ***Giglio***, supra. Had the evidence been disclosed to the defense, counsel could have tailored a strategy with the evidence to impeach Mr. Francis, damage his credibility; and there is a reasonable probability that this would have changed the outcome of the proceedings.

Mr. Williams further submits that had the Court been aware that the prosecutor threatened Mr. Francis to testify and Mr. Francis' identification was influenced by another witness (See: Exhibit), the Court may have granted Mr. Williams' Motion to Suppress.

By the start of trial, the prosecutor was aware that Mr. Francis was still not certain in his identification of Mr. Williams, and desired that he be allowed to not testify (See: Exhibit). Nonetheless, the evidence was withheld by the State from the defense. Therefore, the clear import was to prevent the defense from showing the jury that Mr. Francis was still not certain. Mr. Francis had been threatened with arrest by the prosecutor is he did not testify (See: Exhibit).

Mr. Williams' defense was severely prejudiced by non-disclosure of the evidence. Mr. Francis was not examined or cross-examined at trial moreover, the jury was left with the "un-impeached" impression that Mr. Francis was a college student from out-of-state volunteering his services in New Orleans rebuilding home through the Episcopal Diocese, who stood to gain nothing from cooperating

with the prosecutor. However, Mr. Williams was convicted.

Further, this was a ruse – and the prosecutor knew it. During trial, the following colloquy took place between Mr. Francis and the prosecutor:

Q: And were you sure that the person you identified was the person that robbed you?

A: Yes.

Q: And how sure were you?

A: A hundred percent.

Q: When was it – what were you able to identify during this – during this procedure that made you so sure that the person you identified was in fact the same person that robbed you?

A: He had the exact same fact, clean cut, same build. The white jacket with zipper and red writing, baggy dark pants, and dark shoes.

(Vol. I, p. 100, lines 24-32).

Nothing in the record indicates that the prosecutor made any attempts to correct the testimony. In addition, the fact that Mr. Francis informed the prosecutor that he was still uncertain in his identification and desired that he be allowed to not testify, and then be threatened if he does not testify, presents a crucial matter for impeachment that should have been disclosed and corrected.

There is no doubt that the Federal Constitution protects a defendant's rights to confront and cross-examine a witness about any bias or partiality arising from any "vulnerability" to the State or fear of future State action. ***Davis v. Alaska***, 415 U.S. 308, 318 (1974)(Defendant must be allowed to fully cross-examine witness on facts giving rise to vulnerability; in this case being on probation, or fear of investigation). As the Court in ***Davis*** pointed out, this form of cross-examination has long been recognized and protected in constitutional law.

The impeachment of such evidence has long been recognized as is well described in the Fifth Circuit. Here, due to prosecutorial misconduct, Mr. Williams was prevented from alerting the jury to the fact that far from being unimpeachable, Mr. Francis had been threatened by the prosecutor to testify

against Mr. Williams. Therefore, the jury was entitled to know Mr. Francis' interest of lack thereof. And, what may have motivated Mr. Francis to perform for the State. Mr. Williams avers that Mr. Francis swore in his Affidavit that "facing a possible arrest had a bearing on his return to New Orleans to testify" (See: Exhibit). Moreover, Mr. Francis was dramatically presented to the jury as the State's best witness, an unimpeachable college student, volunteering his services in New Orleans rebuilding houses through the Episcopal Diocese Office of Disaster Response Efforts.

Furthermore, the prosecutor's line of questioning left the impression on the jury that Mr. Francis was positive once he made his identification. When, in fact, Mr. Francis was not positive and desired not to testify (See: Exhibit).

During trial, the following colloquy ensued between Mr. Francis and the prosecutor:

Q: And Andy, as you sit here today, how sure are you that the person you identified in court is the person that robbed you?

A: One hundred percent.

(Vol. 1, p. 106, lines 5-7).

The prosecutor had the duty to correct what he knew to be false. ***Napue v. Illinois***, supra. But, had the evidence been disclosed to the defense, it would have been apparent through the impeachment of Mr. Francis that he was still not certain in his identification and wished not to testify – but was told he would be arrested if he did not come back to New Orleans to testify (See: Exhibit). More disturbing, it is clear that the prosecutor's non-disclosure of the material impeachment evidence was only for the purpose of preventing the defense from impeaching Mr. Francis at trial.

Mr. Francis' reliability was determinative of Mr. Williams' guilt or innocence, and evidence affecting Mr. Francis' credibility should have been known to the jury. ***Giglio***, supra. More importantly, the prosecutor had the duty to identify and disclose material impeachment evidence. Instead, the prosecutor engaged in skullduggery which renders Mr. Williams' trial fundamentally unfair.

As stated above, Mr. Francis was a key prosecution witness; and any evidence that Mr. Francis could be arrested if he did not testify, would have reduced Mr. Francis' credibility. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence, he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. ***Kyles v. Whitley***, 115 S.Ct. 1555 (1995). A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." ***Bagley***, 473 U.S., at 678, 105 S.Ct., at 3381.

The prosecutor knew the material impeachment evidence was favorable to the defense. With the undisclosed evidence, competent counsel could have damaged Mr. Francis' credibility, preventing lengthy argument by the prosecutor.

In Closing Argument, the prosecutor argued to the jury that Mr. Francis should be found reliable: 95 percent would be good for a lot of people out there, yeah, that's him. I am 95 percent sure that's him. But these volunteer Christians wanted to be one hundred percent sure (Vol. 2, p. 143, lines 7-9). Then he was one hundred percent sure (Vol. 2, p. 143, line 14). He wants you to think that they weren't sure and they were being forced to identify him. But, in actuality, he didn't want an innocent person to be arrested until he was one hundred percent sure that this was him (Vol. 2, p. 143, lines 2-6).

As the prosecutor argued to the jury, the evidence which would have shown that the prosecution had, in fact, threatened the witness with arrest if he didn't testify, was concealed from the defense. The prosecutorial misconduct hindered the defense from offering any rebuttal evidence affecting Mr. Francis' credibility. In ***United States v. Bagley***, 473 U.S. 667, the United States Supreme Court recognized: "Under the standard stated above, the reviewing court may consider directly, any adverse effect that the prosecutor's failure might have had on the preparation or presentation of the defendant's case."

Mr. Williams has demonstrated the evidence was suppressed by the prosecutor. The evidence was favorable to the defense in that it would have impeached Mr. Francis. The evidence was material and undermined confidence in the verdict.

The conviction and sentence in this case must be reversed based upon the illegal actions of the prosecutor whose primary objection was apparently to convict at any cost, rather than subject the case to the truth seeking process. Mr. Williams was deprived of any hope of a fair trial, Due Process and Equal Protection of the Law.

## CONCLUSION AND PRAYER

**WHEREFORE, PREMISES OF MR. WILLIAMS CONSIDERED:**

"What you've done is probably one of the most heinous crime I've ever been party to … The good Samaritan … came to the aid of a total stranger. That's what gives this story its real impact."

Though the trial court judge made many efforts to conceal his bias against Mr. Williams, his comments when sentencing Mr. Williams to ninety-nine years, laid bare his real feelings regarding this case. The foundation for his multiple rulings hamstringing Mr. Williams' ability to present his defense and the exhibited animosity to Mr. Williams' counsel during the trial are all explained. No rational person could or would describe this ordinary Armed Robbery as "one of the most heinous crimes" adjudicated in the past twenty-five years in Section "F."

Mr. Williams as deprived of *Due Process of Law* when he was subjected to a warrant-less arrest hours after the robbery. He was not "promptly arrested" and returned to the scene of the crime. The conflicting accounts of the two lay witnesses and the detective, establish that if there was ever a case in Louisiana where the identification procedure was not trustworthy, this case is it. The three proffered three completely different descriptions of the identification procedure and Mr. Francis testified an additional one, that Detective Cologne said "never happened."

If this case is not "it," how or when could there ever be one? Mr. Williams "identification" was not reliable and it should have never been submitted to the jury. The egregious errors made during the course of his trial and the prosecution overreaching in Rebuttal Argument, rob the victim of any legitimacy as a matter of law.

Mr. Robert Williams #396029, respectfully prays that this Honorable Court will accept his foregoing "Memorandum of Law in Support of Petition for Federal Habeas Corpus" and consider same in concert with his "Application for Federal Habeas Corpus" pursuant to *28 U.S.C.A. § 2254*. Mr. Williams, further prays that this Honorable Court, after due consideration of the law and the facts presented by Mr. Williams in these proceedings, that Mr. Williams is granted federal habeas corpus and that his underlying state conviction and sentence is vacated, and set aside.

Respectfully submitted,

[signature]

Robert Williams, #396029
CBA/LR-6
Louisiana State Penitentiary
Angola, Louisiana 70712

## CERTIFICATE OF SERVICE

I, Robert Williams 396029, hereby certify that a true and correct copy of the forgoing has been served upon the Respondent herein, through the Office of the District Attorney, Parish of Orleans, by placing same in the Institution's Legal Mail System for depositing in the U.S. Mail, properly addressed and with proper, first-class postage pre-paid, this 6th day of June, 2016.

[signature]

Robert Williams

# EXHIBIT "A"

## Affidavit of Emily Zolynsky

## Dated August 25, 2011

# AFFIDAVIT OF EMILY ZOLYNSKY

I, Emily Zolynsky, declare the following:

1. My name is Emily Zolynsky. My date of birth is May 19, 1988.

2. Andrew Francis's phone number is listed as 641-990-4050 on a police report that I viewed in connection with Robert Williams' case.

3. I attempted to call Andrew Francis at that phone number and the call went to a voicemail identified as the voicemail of Andrew Francis's cell phone.

4. I spoke with Katie Mears on the telephone on August 24, 2011 and August 25, 2011.

5. I expressed to Katie Mears a desire to speak with Andrew Francis and Katie Mears said she would see if she could find out a good phone number for me to reach Andrew Francis.

6. When I spoke with Katie Mears on August 25, 2011 Katie Mears informed me that she learned that Andrew Francis is currently studying abroad in India and will be unavailable until December 2011.

I declare under penalty of perjury that the foregoing is a true representation to the best of my recollection.

Executed this 25 Day of August 2011.

[signature]
EMILY ZOLYNSKY

Sworn to and subscribed before me this 25th day of August 2011.

[signature]
PUBLIC NOTARY 109281

# EXHIBIT "B"

## Affidavit of Emily Zolynsky

## Dated August 25, 2011

# AFFIDAVIT OF EMILY ZOLYNSKY

I, Emily Zolynsky, declare the following:

1. My name is Emily Zolynsky. My date of birth is May 19, 1988.

2. I spoke with Katie Mears on the telephone on August 24, 2011 and August 25, 2011.

3. Katie Mears told me that in 2008, she was employed by the Episcopal Diocese of Louisiana.

4. Katie Mears told me that she was a supervisor of the rebuilding of homes through the Episcopal Diocese Office of Disaster Response efforts in New Orleans in 2008.

5. Katie Mears told me that at the time, Andrew Francis and Paul Currer were volunteers working on rebuilding houses through this program.

6. Katie Mears told me that on a cold morning in 2008 Andrew Francis and Paul Currer told her they were robbed by a man with a gun as they were in the process of unloading lumber at an empty house in the 7th Ward.

7. Katie Mears told me that Andrew Francis and Paul Currer told her they called her immediately before they called the police to report the robbery.

8. Katie Mears told me that shortly after they called her and told her they were robbed, she met with Andrew Francis and Paul Currer at a McDonald's.

9. Katie Mears told me that she heard from Andrew Francis the description of the robber that Andrew Francis gave the police was that of a young, black male who was wearing a white hoodie and jeans.

10. Katie Mears told me that Andrew Francis told her that a few hours after the incident the police called Andrew Francis and informed him that the police had detained a male involved in a carjacking uptown who matched the description of the man who had robbed him and Paul Currer.

11. Katie Mears told me that Andrew Francis told her that he went with the police to try to identify the suspect that the police had detained.

12. Katie Mears told me that she was not present, but Andrew told her that the police informed Andrew that the man the police had detained had been a suspect in murder charges.

13. Katie Mears told me that she was not present, but Andrew told her the police had Andrew standing about a block away from the man the police had detained and Andrew told the police that Andrew had no idea if that was the man who had robbed Andrew and Paul.

14. Katie Mears told me that she was not present, but Andrew told her that the police had formed a "human shield" between Andrew and the suspect that the police had detained as an effort to protect Andrew and at this point, Andrew was petrified while he was moved closer to the suspect the police had detained.

15. Katie Mears told me that she was not present but Andrew informed her that Andrew was still not certain if the suspect the police had detained was the same man who had robbed Andrew and Paul when they did the procedure in the above paragraph.

16. Katie Mears told me that the police told Andrew that the police would have to let this man go free if Andrew did not identify the man as the man who robbed Andrew and Paul, at which time Andrew then told the police that the police had the man who robbed Andrew and Paul.

17. Katie Mears told me that she met up with Andrew Francis at the police station off of St. Claude where Andrew made another identification of the same man as that man was sitting in a holding cell and Andrew walked by in the hallway.

18. Katie Mears told me that Andrew Francis informed her that Andrew was not positive in Andrew's identification.

19. Katie Mears told me that Andrew Francis said he was steered by the police in his identification of the defendant.

I declare under penalty of perjury that the foregoing is a true representation to the best of my recollection.

Executed this 25 Day of August 2011.

EMILY ZOLYNSKY

Sworn to and subscribed before me this 26th day of August 2011.

PUBLIC NOTARY LA Bar# 31281

# EXHIBIT "C"

## Affidavit of Catherine Mears
## Dated August 26, 2011

Episcopal
Relief & Development
Healing a hurting world

AFFIDAVIT OF CATHERINE MEARS

I, Catherine Mears, declare the following:

1. My name is Catherine Mears. My date of birth is May 13, 1981.

2. In 2008, I was employed by the Episcopal Diocese of Louisiana.

3. I was a supervisor of the rebuilding of homes through the Episcopal Diocese of Louisiana Office of Disaster Response efforts in New Orleans in 2008.

4. At the time, Andrew Francis was a long-term intern crew chief and Paul Currer was a volunteer working on rebuilding houses through this program.

5. On a cold morning in 2008 Andrew Francis and Paul Currer told me they were robbed by a man with a gun as they were in the process of unloading lumber at an empty house in the 7th Ward.

6. Andrew Francis and Paul Currer told me they called me immediately before they called the police to report the robbery.

7. Shortly after they called me and told me they were robbed, I met with Andrew Francis and Paul Currer at a McDonald's where we met the police.

8. I heard from Andrew Francis the description of the robber that Andrew Francis gave the police was that of a young, black male who was wearing a white hoodie and jeans.

9. Andrew Francis told me that a few hours after the incident, the police called Andrew Francis and informed him that the police had detained a male involved in a carjacking uptown who matched the description of the man who had robbed him and Paul Currer.

10. Andrew Francis told me that he went with the police to try to identify the suspect that the police had detained.

11. I was not present, but Andrew told me that the police informed Andrew that the man the police had detained had been a suspect in murder charges.

12. I was not present, but Andrew told me the police had Andrew standing about a block away from the man the police had detained and Andrew told the police that Andrew had no idea if that was the man who had robbed Andrew and Paul.

13. I was not present, but Andrew told me that the police had formed a "human shield" between Andrew and the suspect that the police had detained as an effort to protect Andrew and at this point, Andrew was petrified while he was moved closer to the suspect the police had detained.

Episcopal Relief & Development
Healing a hurting world

14. I was not present but Andrew informed me that Andrew was still not certain if the suspect the police had detained was the same man who had robbed Andrew and Paul when they did the procedure in the above paragraph.

15. The police told Andrew that the police would have to let this man go free if Andrew did not identify the man as the man who robbed Andrew and Paul, at which time Andrew then told the police that the police had the man who robbed Andrew and Paul.

16. I met up with Andrew Francis at the police station off of St. Claude. Andrew made another identification of the same man as that man was sitting in a holding cell and Andrew walked by in the hallway.

17. Andrew Francis informed me that Andrew was not positive in Andrew's identification.

18. Andrew said he had been steered in his identification of the defendant.

I declare under penalty of perjury that the foregoing is a true representation to the best of my recollection.

Executed this 26 Day of August 2011.

CATHERINE MEARS

WITNESS

WITNESS

Sworn to and subscribed before me this 26 day of August 2011.

PUBLIC NOTARY

JOYLYNN ALEMAO
Notary Public, State of New York
Qualified in Kings County
Reg. No. 01AL6208952
My Commission Expires 08-03-2013

815 Second Avenue, New York, NY 10017
t. 1.800.334.7626 f. 212.687.5302
er-d@er-d.org www.er-d.org

# EXHIBIT "D"

## Affidavit of Bobbie Bester
## Dated July 5, 2013

**STATE OF LOUISIANA**
**PARISH OF ORLEANS**

## AFFIDAVIT OF BOBBIE BESTER

I, Bobbie Bester, do hereby depose and state that I am the mother of Robert Williams, and that I received pertinent information from a one Catherine Mears while attending a motion hearing in the Criminal District Court in Orleans Parish.

1. **I declare that while attending a motion hearing on behalf of my son, Robert Williams, that I was approached by Ms. Mears, who stated to me that she believed that they have the wrong man.**

2. **I further declare that Ms. Mears gave me her name and phone number.**

3. **I further depose and state that I attempted to give the information to my son's attorney, Gary Wainwright, but Mr. Wainwright refused to accept the information and refused to investigate the matter. In fact, Mr. Wainwright, resisted my advances concerning the matter on numerous occasions and became indifferent to the information that was provided to me by Ms. Mears.**

I hereby do swear that these allegations of facts contained in this affidavit is true and correct to the best of my knowledge and recollection.

Executed on this 5 day of July, 2013.

S/ Bobbie Bester
Bobbie Bester

Signed before me on this 5 day of July, 2013.

[signature]
**NOTARY PUBLIC**

BRITTANY WAGGENER - ID NO. 134099
NOTARY PUBLIC
COMMISSIONED FOR LIFE
ORLEANS PARISH, LA

# EXHIBIT "E"

## Affidavit of Alisa Bester

## Dated July 31, 2013

**STATE OF LOUISIANA**
**PARISH OF ORLEANS**

## AFFIDAVIT OF ALISA BESTER

I, Alisa Bester, do hereby depose and state the following sworn facts.

1. **I declare that I was in the Criminal District Court attending a motion hearing for Robert Williams, and I was accompanied by Mr. Williams mother, Bobbie Bester.**

2. **I further declare that I was in the presence of Bobbie Bester when she was approached by a lady, Katie, who stated that she believed that they have the wrong man.**

3. **I declare that I observed the lady, Katie, give Ms. Bester her name and phone number.**

4. **I further declare that myself and Ms. Bester made several attempts to convey the information to Mr. Williams Attorney, Gary Wainwright, but Mr. Wainwright refused to entertain any discussion related to the information that was provided by the lady, Katie.**

I swear under the penalty of perjury that the allegations of facts contained in this affidavit is true and correct to the best of my knowledge and recollection.

Executed on this 31st day of July, 2013.

S/ Alisa Bester
Alisa Bester

Signed before me on this 31st day of July, 2013.

**NOTARY PUBLIC**
Candido Castro
Notary Public
ID No. 51113
Parish of Orleans, State of Louisiana
My commission is by revocation.
Date: 7/31/13

# EXHIBIT "F"

## Affidavit of Stuart M. Weg. (esq.)

## Dated March 24, 2014

# AFFIDAVIT

STATE OF LOUISIANA

PARISH OF ORLEANS

Before me, the undersigned notary public, personally came and appeared:

STUART M. WEG, Date of Birth June 16, 1961,

who, after being duly sworn, did depose and state

1. My name is Stuart Martin Weg and I am licensed to practice law in the State of Louisiana, Bar number 31357.
2. January 1, 2008 through February 12, 2012, I was employed by the Orleans Public Defenders as a full-time Staff Attorney, including on or about August 21, 2011.
3. Pursuant to appointment by the Hon. Judge Robin Pittman, I was assigned by the Orleans Public Defenders to represent Robert Williams, 476-208, for the purpose of resentencing after remand by the Louisiana Fourth Circuit Court of Appeal in 2012-KA-0050.
4. I did not represent Mr. Williams at any time prior to the remand for resentencing.
5. Prior to the resentencing hearing for Mr. Williams, he provided to me the name and telephone number for Katie Mears, which Mr. Williams had obtained from his mother.
6. With respect to Ms. Mears, Mr. Williams advised me prior to his resentencing that Ms. Mears was assisting with the rebuilding of homes through the Episcopal Diocese of Louisiana, Office of Disaster Response efforts, and was the supervisor of the individual or individuals who reported the robbery of the victims at issue in this case.
7. Mr. Williams further advised me prior to his resentencing that Ms. Mears was either the person who called 911 to report the robbery herself or was the person contacted immediately after the robbery victims called 911 themselves.
8. Mr. Williams also informed me prior to his resentencing, that his family members, including his mother, as well as Ms. Mears, were present in Orleans Parish Criminal District Court during a Motion Hearing held June 5, 2008.
9. Also prior to his resentencing hearing, Mr. Williams advised me that Ms. Mears gave her name and phone number to Mr. Williams' mother.
10. Further, prior to his resentencing hearing, Mr. Williams told me that on June 5, 2008 Ms. Mears told Mr. Williams' family, including his mother, that the testimony at that hearing she attended did not accurately describe the uncertainty of identification of one of the witnesses that was communicated by that victim directly to Ms. Mears.

11. I gave the information I received from Mr. Williams with respect to Ms. Mears to Emily Zolynsky, an Investigator working with the Orleans Public Defenders at that time, and assigned Ms. Zolynsky the task of further investigation.
12. Ms. Zolynsky located Ms. Mears and interviewed her regarding the information Ms. Mears provided to the family of Mr. Williams.
13. Ms. Zolynsky obtained a sworn affidavit from Ms. Mears detailing information as told to her by Ms. Mears, and I hand delivered the affidavit in court to Mr. Williams.
14. Based upon her interview of Ms. Mears, Ms. Zolynsky uncovered information that one of the victims of the robbery told Ms. Mears that he was not initially capable of identifying Mr. Williams as the perpetrator of the robber.
15. Based upon her interview of Ms. Mears, Ms. Zolynsky uncovered information that one of the victims of the robbery also told Ms. Mears that he was not certain in his eventual identification of Mr. Williams as the perpetrator, that he had been steered by the police into identifying Mr. Williams, and that he had been pressured into expressing certainty in his identification that did not accurately reflect his level of uncertainty.
16. Ms. Mears further advised Ms. Zolynsky that she was willing to come to court to testify as to the above facts before Mr. Williams' trial.
17. Ms. Mears also advised Ms. Zolynsky that she was never contacted by trial counsel for Mr. Williams, though she provided her contact information to Mr. Williams family, in particular his mother, for that purpose.
18. Upon receiving this new evidence, I filed it with the court in support of a Motion for New Trial, which the court denied without hearing prior to resentencing Mr. Williams.

I declare under the penalty for perjury that I have read this affidavit, and it is true and correct to the best of my knowledge. No one has forced, threatened, or coerced me in any way to sign this affidavit.

STUART M. WEG

Sworn to and subscribed before me
this 24th day of March 2014.

Notary Public
James Hayes
Notary 92102

# EXHIBIT "G"
## Affidavit of Andrew Francis
## Dated May 29, 2014

Sonoma County State of California

Comes Now, Andrew Francis, being duly sworn does depose and state as follows:

1. My name is Andrew Francis (DOB 9/04/1988) and I was born in Des Moines, Iowa
2. Paul Currer and I were victims of an armed robbery within a residence located at 1814 Duels Street New Orleans, LA on January 21, 2008.
3. After speaking with police the same morning of the robbery, Paul and I were contacted by members of the New Orleans Police Department after they apprehended a potential suspect.
4. The police transported us to the location of the suspect that same day for identification purposes.
5. Upon our arrival, Paul and I exited the police cruiser. After noticing a man in handcuffs Paul and I conferred together.
6. After a few moments of discussing amongst ourselves, the officers informed Paul and I that we could not be together for the identification process.
7. It was difficult to see the suspect because he was positioned far from us. At the time, I was not completely sure if the suspect was the perpetrator but Paul's certainty reassured me.
8. I informed the officers that I was not 100% sure if the suspect was the perpetrator.
9. I was told by police that I needed to confirm or deny the suspects status.
10. That same day, Paul informed me that he was a retired Central Intelligence Agency analyst. He further stated that facial recognition was one of his specialties. The nature of this information and Paul's identification of the suspect allowed me to reconcile some of the doubt I had.
11. The assistant district attorney, Kevin Guillory, and I remained in contact throughout the summer. Per Mr. Guillory, the trail date was rescheduled a couple of times. In one instance, I was informed by Mr. Guillory that the defense attorney had a death in the family.
12. At a point later in the summer, I spoke with Mr. Guillory about possible not testifying. Mr. Guillory informed that if I refused to testify that they would fly up to Iowa, arrest me and bring me back down to New Orleans.
13. Facing a possible arrest had a bearing on my decision to return to New Orleans and testify at the trial.

I swear that the foregoing is true and accurate to the best of my knowledge and belief, this ______

day of 05/29 2014.

[signature]

Andrew Francis

JUSTIN LACY
Commission # 1934870
Notary Public - California
Sonoma County
My Comm. Expires May 5, 2015

State of California, County of Sonoma
Subscribed and sworn to (or affirmed) before me on this 29th day of May 2014
by Andrew Francis
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

[signature]
Signature

RECEIVED
JUN 08 2016
Legal Programs Department

SCANNED at LSP and Emailed
6/8/16 by OM . 86 pages
date initials No.

AO 241
(Rev. 10/07)



**Petition for Relief From a Conviction or Sentence
By a Person in State Custody**

**(Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)**

**Instructions**

1. To use this form, you must be a person who is currently serving a sentence under a judgment against you in a state court. You are asking for relief from the conviction or the sentence. This form is your petition for relief.

2. You may also use this form to challenge a state judgment that imposed a sentence to be served in the future, but you must fill in the name of the state where the judgment was entered. If you want to challenge a federal judgment that imposed a sentenced to be served in the future, you should file a motion under 28 U.S.C. § 2255 in the federal court that entered the judgment.

3. Make sure the form is typed or neatly written.

4. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5. Answer all questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6. You must pay a fee of $5. If the fee is paid, your petition will be filed. If you cannot pay the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution if holding for you. If you account exceeds $________, you must pay the filing fee.

7. In this petition, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different court (either in the same state or in different states), you must file a separate petition.

8. When you have completed this form, send the original and two copies to the Clerk of the United States District Court at this address:

Clerk's Office, U.S. District Court
Eastern District of Louisiana
500 Poydras Street, Room C-151
New Orleans, LA 70130

9. **<u>CAUTION:</u> You must include in this petition all grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

10. **<u>CAPITAL CASES:</u> If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**